TAL Financial Corporation *vs.* CSC Consulting, Inc.

Middlesex. February 7, 2006. - March 31, 2006.

Present: Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Damages,* Liquidated damages. *Contract,* Equipment lease. *Practice, Civil,* Burden of proof, Attorney's fees. *Law of the Case.*

In an action arising out of a default on a lease agreement, the trial judge properly calculated the damages award. [428-429]

This court concluded that when a liquidated damages provision in a real estate contract, or other commercial contract falling outside the scope of the Uniform Commercial Code, is challenged as unenforceable, the burden of proof regarding the enforceability of the provision rests squarely on the party seeking to set it aside [429-431]; thus, in an action arising out of a default on a lease agreement entered into between the plaintiff and the defendant's predecessor in interest (the defaulting party), in which the defendant established that the liquidated damages provision called for damages that were grossly disproportionate to a reasonable estimate of anticipated damages at the time of contract formation, the trial judge properly concluded that the damages provision was unenforceable [431-433].

A prevailing party was not entitled to an award of attorney's fees that, in the circumstances, were unreasonable as a matter of law. [433-434]

Civil action commenced in the Superior Court Department on July 9, 2002.

The case was heard by *Margaret R. Hinkle*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Leonard M. Singer* for the plaintiff.

*Andrew C. Griesinger* for the defendant.

Greaney, J. This lawsuit, here on cross appeals, arises out of a default on a lease agreement entered into between the plaintiff, TAL Financial Corporation (TAL), and Onward Technologies, Inc. (Onward), the predecessor in interest of the defendant, CSC Consulting, Inc. (CSC). Following a bench trial, a judge in the Superior Court (1) awarded TAL $9,471 in contract damages;

(2) concluded that the liquidated damages provision of the lease was unenforceable; and (3) awarded TAL attorney's fees in the amount of $17,499 and costs in the amount of $1,000. TAL has appealed, claiming error in the judge's calculation of damages and in her conclusion as to liquidated damages. On cross appeal, CSC challenges the award of attorney's fees and costs. We transferred the case here on our own motion to consider an issue only indirectly raised by the parties: the proper allocation of the burden of proof when a party in contractual default seeks to void a provision in the contract providing for the payment of liquidated damages. We hold that the burden of proof rests with the party challenging the provision's enforcement. The remaining issues presented in this case are ordinary and were, for the most part, correctly decided by the judge. We agree with CSC, however, that attorney's fees should not have been awarded. Accordingly, we vacate that part of the judgment directing that TAL recover attorney's fees, and affirm the remaining portions of the judgment awarding damages and costs to TAL.

We summarize the judge's findings, supplemented by us from undisputed testimony and documentary exhibits at trial. TAL is a boutique finance company, located in Framingham, that specializes in extending credit to small companies through equipment leasing. TAL's president and sole shareholder is Howard D. Siegel. CSC is a company with headquarters in Waltham that provides information technology consulting services for businesses.[1] In the summer of 1997, Onward was a start-up company, located in Natick, engaged in the business of website development.

On July 28, 1997, TAL and Onward entered into an agreement for the lease of computer hardware, telephone equipment, software, and office furniture needed by Onward to start its business. The agreement consisted of a master lease and the first of what would be a series of three schedules incorporating the terms of the master lease. The first schedule (schedule one) identified computer hardware, telephone equipment, and software licensed to Onward, and provided for monthly payments from Onward to TAL of $1,692.55, including taxes, for

---

[1] CSC Consulting, Inc. (CSC), is a subsidiary of Computer Sciences Corporation, which is not a party to this lawsuit.

thirty-six months. On September 3, 1997, Onward and TAL executed a second schedule (schedule two) which identified additional computer hardware, used furniture, and software licensed to Onward. Schedule two provided for monthly payments of $2,587.55, including taxes, for thirty-six months. On January 28, 1998, Onward and TAL executed a third and final schedule (schedule three) to the master lease, also identifying computer hardware, used furniture, and software licensed to Onward. Schedule three provided for monthly payments of $716.07, including taxes, for thirty-six months.

The master lease provided that each schedule would begin as of the first day of the month following Onward's acceptance of the leased equipment and end as of the last day of the calendar month in which the schedule was executed. Thus, schedule one began on August 1, 1997, and was to end July 31, 2000; schedule two began on October 1, 1997, and was to end September 30, 2000; and schedule three began on February 1, 1998, and was to end on January 31, 2001. The schedules provided for TAL to receive a total of $179,862.12 over thirty-six months. At the time each schedule was executed, Onward paid TAL in advance the first, thirty-fifth, and thirty-sixth payments due.

TAL paid a total of $140,433.62 for all of the items listed in the schedules, including $76,590.15 for computer hardware and telephone equipment, $33,305.40 for used furniture, and $30,538.07 for software.[2] Although TAL received bills of sale for the computer hardware, telephone equipment, and furniture, the software was never owned by TAL, but was licensed to Onward.

The following provisions of the master lease are relevant for our purposes. Section 6 of the master lease provides: "Unless ninety (90) days prior written notice of termination is given by either party to the other, the Lease Term shall be automatically extended for successive annual periods and payments for

---

[2]TAL never selected or took possession of any equipment or furniture identified in the schedules, which were received by Onward at its Natick facility. In some instances, Onward paid for the items and was reimbursed by TAL, but, more frequently, the invoices for the items delivered to Onward were submitted to, and paid directly by, TAL.

monthly rent shall continue to be made . . . ." Section 20 of the master lease provides that, in the event of a default by Onward, then TAL "at its sole option" may elect one or more of several alternatives, including (1) declaring a default and demanding payment of the entire amount of rent remaining to be paid over the balance of the lease, and (2) recovering "as liquidated damages for loss of a bargain and not as a penalty (X) an amount equal to the present value of all moneys to be paid by [Onward] during the remaining Initial Term or any renewal period then in effect . . . discounted at the rate of six percent (6.0%) . . . plus (Y) eighteen percent (18%) of the Acquisition Cost to [TAL] of such Equipment and/or any Other Equipment." Section 20 additionally provides that Onward's failure to return any of the leased items would entitle TAL to recover "as liquidated damages for breach of this Lease, and not as a penalty, an amount equal to the sum of the amounts specified in items (X) and (Y) [set forth] above." Finally, the master lease provided that TAL could recover "all costs and expenses, including, without limitation, reasonable attorneys' fees" incurred in exercising its rights under the lease agreement.[3]

On or about March 31, 1998, CSC acquired the stock of Onward, which merged into CSC on or about April 5, 1999, thereby assuming the legal and financial obligations of Onward under the master lease and schedules. After the merger and acquisition, CSC continued to make monthly payments set forth in the schedules. On or about August, 1999, Onward's employees moved from Natick to CSC's Waltham offices. Either before or during the move, CSC discarded most of the equipment and furniture covered by the master lease. CSC also misplaced the lease documents.

At various times during 2000, CSC representatives requested Siegel to provide a copy of the master lease, an inventory of what the lease covered, and the amount that would settle the

---

[3]Section 15 of the master lease states that, "[i]f any item of Equipment is lost, stolen, destroyed, or irreparably damaged," Onward would be liable for the amount of rent due at the time of loss, plus the full replacement cost of the items at the time of loss. Although CSC conceded that the leased equipment has either been lost or destroyed, it is liquidated damages provided for in section 20 (6), plus its reasonable attorney's fees and costs, that TAL seeks to recover.

remaining amount due. Although Siegel responded with a list of the items covered under the lease, he did not provide a copy of the lease. After receiving the inventory list, CSC informed Siegel that all of the items were either discarded or lost, with the possible exception of a conference table and chairs. CSC advised Siegel that CSC was making monthly payments for items it did not have.

On March 19, 2001, an office manager for CSC sent Siegel a letter stating in part: "It is our intent to pay the balance of this account in full. Please send me the necessary information and history on this account so this matter can be resolved." During March or April, CSC's assistant comptroller informed Siegel in a telephone conversation that CSC wished to make a final payment to satisfy its remaining obligations under the lease. In response, Siegel provided CSC with a "payoff" schedule that indicated an amount of $66,056.80 still owed by CSC under the lease.[4] CSC thereafter paid TAL an additional $15,344.72, but, since May, 2001, has made no further payments to TAL. In total, CSC and Onward have paid TAL $237,220.80.

In August, 2001, TAL at last provided a copy of the master lease and schedules to CSC. In a letter dated September 12, 2001, TAL's vice-president of finance, Amy Wersted, advised CSC that it was in default and the "amount of the receivable remaining over the balance of the lease term of all equipment leases is now immediately due and payable, including late charges." Wersted stated in the letter that TAL expected "payment of $73,323.06[5] by September 21, 2001, to satisfy [CSC's] debt" and expected CSC to "immediately return possession of all equipment." In a letter sent to Siegel on October 12, 2001, CSC's vice-president of finance and administration, John L. Ryan, offered to pay TAL $9,510.25 "in full and final settle-

---

[4]Siegel acknowledged at trial that this amount was inflated. At the time the figure was submitted, CSC (or Onward) had paid TAL a total of $221,876.08, which covered monthly payment through the end of April, 2001. The judge found that, even assuming the lease's extension for a fourth year, future payments due through the end of forty-eight months were only $24,460.03. Moreover, reliance on the liquidated damages provision holding CSC responsible for 18 per cent of the acquisition cost, would only have increased the amount due to $49,738.08, or $16,318.72 less than Siegel claimed was due.

[5]Siegel conceded the inaccuracy of this figure as well.

ment of all matters" arising from the lease and stated: "If there remains any doubt as to our intentions, let me make clear that CSC does not intend to extend any Schedule under the Lease." Siegel subsequently rejected CSC's offer and advised Ryan that TAL did not want any of the leased items returned.

The case proceeded to trial on TAL's claim that CSC's failure to terminate, in writing, the leases under schedule one and two, within ninety days of July 31, 2001, and September 30, 2001, respectively, operated automatically to renew those schedules for twelve additional months, and that CSC's failure to return any of the leased items constituted a default entitling TAL to liquidated damages in the amount of eighteen per cent of its acquisition costs. In sum, TAL claimed damages in the amount of $112,156 (the remaining rental payments it claimed were due on a sixty-month lease, plus late charges, plus liquidated damages). CSC asserted at trial that the requisite notice to terminate was given in March, 2001, and that Siegel's persistent refusal to provide a copy of the master lease and schedules, and repeated submission of erroneous amounts due under the lease, constituted a breach of the covenant of good faith and fair dealing operating as a complete defense to TAL's suit for money owed. Also contested at trial was whether the liquidated damages provision in the master lease calling for eighteen per cent of TAL's acquisition costs was enforceable as a reasonable estimate of actual damages under principles set forth in *Kelly* v. *Marx*, 428 Mass. 877, 880 (1999), or void as an unconscionable penalty.[6]

The judge concluded that, "[w]hile the issue is a close one," CSC had not demonstrated with credible evidence that Siegel's lack of cooperation constituted a breach of good faith and fair dealing.[7] The judge concluded that each of the schedules ran for

---

[6]As we shall point out later, *Kelly* v. *Marx*, 428 Mass. 877 (1999), concerned a liquidated damages provision in a real estate agreement and, as such, is inapposite to this case. The parties' reliance on the *Kelly* case, however, made the principles therein stated the law of the case.

[7]We need not revisit this conclusion or the judge's rejection of CSC's related claims of estoppel or "unclean hands." CSC does not pursue these arguments on appeal but appears satisfied with the amount of damages awarded by the judge.

forty-eight months and assessed damages accordingly. Guided by what was said in *Kelly* v. *Marx, supra,* the judge determined that the liquidated damages provision represented an amount that was grossly disproportionate to a reasonable estimate of actual damages made at the time of contract formation and, thus, was unenforceable. Based on the parties' contractual agreement for the payment by CSC of reasonable attorney's fees and costs associated with a default, the judge awarded TAL the entirety of the amount sought by TAL's counsel, $17,499 in attorney's fees and $1,000.91 in costs. We now turn to the merits.

1. TAL's assertion that the damage award was incorrectly calculated appears based, in part, on a fundamental confusion over the judge's findings on several points disputed by the parties at trial. We accept the judge's findings, which are supported by credible evidence in the record, and now clarify them. The judge determined that TAL had actual notice by the spring of 2001 of CSC's intention to terminate the lease. Because the lease expressly required that notice of termination be in writing, however, it was not until CSC made its intention clear, in its letter dated October 12, that its notice of default became effective. In different circumstances, presumably, CSC's failure to cancel the lease in writing prior to ninety days before their respective termination dates, would automatically have extended schedules one and two to run for another twelve months. The judge found, however, that TAL's September 12 letter advising CSC that it was in default, and demanding the return of all leased equipment, waived its right to claim that the schedules extended beyond forty-eight months. We agree. TAL clearly signaled its intention to treat the schedules under the lease as terminated and seek damages against CSC and, as matter of law, cannot now seek to have them enforced for additional twelve-month terms. See *Buster* v. *George W. Moore, Inc.,* 438 Mass. 635, 655-656 (2003); *Coggins* v. *New England Patriots Football Club, Inc.,* 397 Mass. 525, 539 (1986); *Dalton* v. *American Ammonia Co.,* 236 Mass. 105, 107 (1920).[8]

CSC has submitted a document summarizing all payments

---

[8]TAL's insistence that any waiver, as of September 12, 2001, could not "undo" lease extensions that occurred prior to that date, pursuant to section 6 of the master lease, is negated by the judge's clear finding that TAL had waived

made under the lease, which indicates that, as of May 10, 2001, CSC had paid TAL a total of $232,855 in rental payments for items listed under the three schedules.[9] TAL does not dispute the document's accuracy. Crediting CSC for two months rent paid in advance at the inception of each schedule, CSC was current in its payments through the end of July, 2001. As a result, there remained two monthly payments of $2,587.55, or $5,175.10, due on schedule two and six monthly payments of $716.07, or $4,296.42, due on schedule three, for a total amount due of $9,471.

2. The judge determined that the liquidated damages provision calling for the present value of all future rent, plus eighteen per cent of the acquisition costs of all the items listed in the schedules, was an unreasonable estimate of any actual damage that could have been anticipated at the time the schedules were executed and, therefore, unenforceable. The judge's reasoning incorporated her findings that (a) the majority of items to be leased were not yet identified at the time the parties agreed to the provision in the master lease[10]; (b) the lease did not provide for the reduction of the liquidated payment if the lease extended beyond the original thirty-six month term; and (c) it could have

its right to declare such an extension. This finding is one of fact. See *Dynamic Mach. Works, Inc.* v. *Machine & Elec. Consultants, Inc.*, 444 Mass. 768, 773 (2005); *Mastrullo* v. *Ryan*, 328 Mass. 621, 624 (1952). The judge's finding is supported by considerable evidence in the record documenting ongoing negotiations between CSC and TAL seeking to establish a final payout figure that would reconcile TAL's expectation of payment (and then some) under the lease and CSC's equally strong desire to terminate its remaining contractual obligations. The evidence does not conclusively indicate that TAL's demand for $73,323 "to satisfy the debt" embodied its purported expectation of receiving twelve additional months of rent on schedules one and two. Siegel testified at trial that he could not explain how this figure was derived and that "[he hadn't] a clue" how many months of future payments it included.

[9]According to the summary, CSC had paid TAL a total of $237,220.80. This amount was broken down into filing fees ($1,325); late charges ($2,083.03); property taxes ($957.65); and payments under schedule one ($81,242.40), schedule two ($121,442.30), and schedule three ($30,170.42).

[10]TAL's argument that this finding is not supported by the evidentiary record is directly contrary to its position taken at trial that one difficulty in estimating future damages stemmed from uncertainty as to what equipment would be covered by the lease. We therefore disregard it. See *Canavan's Case*, 432 Mass. 304, 308 (2000).

been anticipated that the leased items had little or no residual value after three years and, thus, the eighteen per cent figure was "grossly disproportionate" to a reasonable estimate of actual damages at the time of contract formation. We agree with the judge's conclusion and much of her reasoning. Before elaborating, however, we consider a matter intrinsically related to our resolution of the liquidated damages issue, but one not raised by the parties, or mentioned by the judge, at trial: which party bears the burden of proof when a clause in a contract providing for payment of liquidated damages is challenged as unenforceable.

Neither this court, nor the Appeals Court, has had occasion to address this question. The United States Court of Appeals for the First Circuit recognized this gap in *Honey Dew Assocs., Inc.* v. *M & K Food Corp.*, 241 F.3d 23, 27 (1st Cir. 2001), and concluded that if this court were to decide the issue, "it would assign the burden of proving the unenforceability of a liquidated damages clause to the party raising that defense." *Id.* We concur in this conclusion and add a few observations.

Under freedom of contract principles, generally, parties are held to the express terms of their contract, and the burden of proof is on the party seeking to invalidate an express term. The burden of proof regarding the enforceability of a liquidated damages clause, therefore, should rest squarely on the party seeking to set it aside. See *Town Planning & Eng'g Assocs., Inc.* v. *Amesbury Specialty Co.*, 369 Mass. 737, 744 (1976); *Hastings Assocs., Inc.* v. *Local 369 Bldg. Fund, Inc.*, 42 Mass. App. Ct. 162, 173 (1997). Any reasonable doubt as to whether a provision constitutes a penalty or a legitimate liquidated damages clause should be resolved in favor of the aggrieved party. We thus join the majority of courts in other States that have considered the question. See, e.g., *Chisholm* v. *Reitler*, 143 Colo. 288 (1960); *Clampitt* v. *A.M.R. Corp.*, 109 Idaho 145, 149 (1985); *Pav-Saver Corp.* v. *Vasso Corp.*, 143 Ill. App. 3d 1013, 1019 (1986); *Rodriguez* v. *Learjet Inc.*, 24 Kan. App. 2d 461, 464-465 (1997); *Shallow Brook Assocs.* v. *Dube*, 135 N.H. 40, 50 (1991); *Metlife Capital Fin. Corp.* v. *Washington Ave. Assocs. L.P.*, 159 N.J. 484, 496 (1999); *P.J. Carlin Constr. Co.* v. *City of N.Y.*, 59 A.D.2d 847, 848 (N.Y. 1977); *Illingworth* v.

*Bushong*, 297 Or. 675, 690 (1984); *Chamberlain Livestock Auction, Inc.* v. *Penner*, 462 N.W.2d 479, 484 (S.D. 1990); *Wassenaar* v. *Panos*, 111 Wis. 2d 518, 526 (1983).

What we have said thus far applies to liquidated damages clauses in real estate contracts, and other commercial contracts falling outside the scope of the Uniform Commercial Code (UCC), incorporated into the General Laws as chapter 106. TAL asserts on appeal that the master lease is governed by art. 2A of the UCC, G. L. c. 106, § 2A-504 (1), which provides for the enforcement of agreements for liquidated damages "but only at an amount or by a formula that is reasonable in light of the then anticipated harm caused by the default or other act or omission." Section 2A-504 (1), however, was at no time brought to the attention of the judge and neither party asserted at trial that their dispute over liquidated damages should be resolved under the UCC. Because the case was argued strictly under principles set forth in *Kelly* v. *Marx*, 428 Mass. 877 (1999), that decision is now the law of the case.[11] See *Hill* v. *Metropolitan Dist. Comm'n*, 439 Mass. 266, 275 (2003); note 6, *supra*.

It has long been the rule in Massachusetts that a contract provision that clearly and reasonably establishes liquidated damages should be enforced, so long as it is not so disproportionate to anticipated damages as to constitute a penalty. See *Kaplan* v. *Gray*, 215 Mass. 269, 270-273 (1913). There is no bright line separating an agreement to pay a reasonable measure of damages from an unenforceable penalty clause. In *Kelly* v. *Marx*, *supra*, we provided guidance as to how a judge should analyze the enforceability of a liquidated damages clause in a purchase and sale agreement. We squarely rejected the "second look" approach, where actual damages resulting from the breach are measured to determine whether enforcement of the agreement for liquidated damages would serve unfairly to punish one party rather than compensate the other "who suffered no loss from the [first party's] breach." *Id.* at 879. Generally, a liquidated damages provision will be enforced when, at the time the agreement was made, potential damages were difficult to

---

[11]While we do not decide the question, we are aware of no reason why the allocation of the burden of proof, as settled above, would not be the same under the UCC.

determine and the clause was a reasonable forecast of damages expected to occur in the event of a breach. Conversely, "[l]iquidated damages will not be enforced if the sum is 'grossly disproportionate to a reasonable estimate of actual damages' made at the time of contract formation." *Id.* at 880, quoting *Lynch* v. *Andrew*, 20 Mass. App. Ct. 623, 628 (1985). This approach, we concluded, will most accurately reflect the expectations of the parties when they contracted for liquidated damages. See *Kelly* v. *Marx, supra* at 880-881.

Section 20 of the master lease contained numerous covenants that TAL could choose to enforce, or not, at its will, irrespective of the circumstances of CSC's default. One such covenant, self-labeled as "liquidated damages for loss of a bargain and not as a penalty," is at issue here. We conclude that CSC carried its burden of establishing that this provision called for damages that were "grossly disproportionate" to a reasonable estimate of anticipated damages at the time the schedules were executed. A reasonable estimate of such damages, occurring after a lease term of thirty-six months (a term guaranteed under the lease), would have been a negligible amount. Failing to provide any recognition for the type, or timing, of the default, while by no means determinative, tends to indicate that the provision's intended purpose was not to estimate the different types of damages that might arise from a future default, but to penalize for any failure, however immaterial.[12] Although we cautioned in *Kelly* v. *Marx, supra* at 879, against use of the "second look approach," the disparity between the stipulated sum (eighteen per cent of acquisition costs, or $25,278) and actual damages (here, none) cannot be ignored in this case, because that dispar-

---

[12]It could have been argued at trial that CSC's failure to return the leased items, as required under the master lease, did not trigger the liquidated damages provision at all, in light of Seigel's express assurances to Ryan that the items need not be returned. See *Dynamic Mach. Works, Inc.* v. *Machine & Elec. Consultants, Inc.*, 444 Mass. 768, 773-774 (2005) (waiver of contract performance may be established by words or conduct); *McCarthy* v. *Tobin*, 429 Mass. 84, 88 (1999) (waiver of condition excuses performance). See also *Realty Developing Co.* v. *Wakefield Ready-Mixed Concrete Co.*, 327 Mass. 535, 537-538 (1951) (conduct does not constitute breach of contract unless wrongful or lacking legal excuse). Nevertheless, CSC appears satisfied with the judgment in TAL's favor and, on appeal, focuses its argument on the penalty nature of the liquidated damages provision.

ity was known at the time of the agreement. The set figure of eighteen per cent of acquisition costs bears no rational relation to the parties' expectation of the true value of the leased items[13] and, moreover, does not take into account TAL's independent ability to collect all future monthly payments still due under the lease. We think it likely that TAL's rejection of CSC's offer of settlement, in October, 2001, was motivated by its anticipation of the windfall it would receive by insisting instead on liquidated damages. TAL's disinterest in seeking return of the leased items undercuts any suggestion to the contrary. We are persuaded that the liquidated damages were, from the outset, intended by TAL to serve as a penalty, and not as a reasonable assessment of damages that actually might occur. See *A-Z Servicenter, Inc.* v. *Segall*, 334 Mass. 672, 676 (1956).

3. Whether TAL is entitled to an award of attorney's fees and costs is governed by the terms of the master lease, which provides for the recovery of "all costs and expenses, including, without limitation, reasonable attorneys' fees" incurred by TAL in exercising its rights under the lease. See *Northern Assocs., Inc.* v. *Kiley*, 57 Mass. App. Ct. 874, 879 (2003). The lease clearly distinguishes between attorney's fees and costs. The plain meaning of the language ("all costs") calls for payment of disbursements made by TAL in connection with this litigation. The lease does not, however, require indemnification for all attorney's fees, but only payment of those that are "reasonable." TAL asserts that the amounts requested, and awarded, was reasonable "[g]iven the length of the trial and the nature and extent of the pretrial proceedings, and the fact that requested fees were clearly and fully documented." We do not agree.

TAL sought in excess of $86,000 in damages at trial. It received only $9,471, a little less than the amount offered by CSC in settlement on October 12, 2001. Significantly, the invoices submitted in connection with the request for attorney's fees and

[13]CSC submitted evidence, through the testimony of an expert appraiser, that software that is licensed, typically, has no resale value, and that computer hardware, after three years, would have little or no resale value. The expert conceded, on cross-examination, that the software might have "some value" if the particular software at issue were transferable. We reject TAL's claim that the judge's findings with respect to the anticipated value of the leased items were not supported by the expert's testimony.

costs reflect that TAL had incurred no legal expenses at all up until that date. After over two years of litigation and three days of trial, TAL sought reimbursement for $17,499 in attorney's fees, and $1,000 in costs, a combined figure almost twice that ultimately recovered in damages.

We recognize that an award of attorney's fees is a highly discretionary matter usually left to the judge. See *Cargill, Inc.* v. *Beaver Coal & Oil Co.*, 424 Mass. 356, 363 (1997); *Stowe* v. *Bologna*, 417 Mass. 199, 204 (1994). In these circumstances, however, we conclude that any award of attorney's fees would not, as matter of law, be reasonable. This case could have, and should have, been resolved long before TAL retained counsel. See *Lattuca* v. *Robsham*, 442 Mass. 205, 211 (2004). For the same reason, we decline to award TAL appellate attorney's fees as requested in its brief.

4. The judgment is modified by striking that part awarding TAL attorney's fees in the sum of $17,499.18, and as so modified is affirmed.

*So ordered.*