Fremont-Smith, Thayer, J.
Plaintiffs NRT New England, Inc. (“Coldwell Banker”) and Plain Road Co. (“Plain Road”) instituted this action seeking a declaratory judgment to establish their rights to a disputed deposit held in escrow following a failed real estate transaction. Defendant Ashby C. Moncure (“Monc-ure”) responded by asserting counterclaims for breach of contract, breach of fiduciary duty, and violations of G.L.c. 93A. The Court granted Moncure’s motion for summary judgment, declaring that Moncure was entitled to the disputed deposit and that Coldwell Banker violated G.L.c. 93A, §9.
Plaintiff Coldwell Banker now moves the Court to reconsider its judgment. In support of its motion, Coldwell Banker attached previously undisclosed correspondence between itself, defendant, and a third party not before the Court. Moncure moves to strike these documents. For the reasons set forth below, defendant’s motion to strike is DENIED. Coldwell Banker’s motion to reconsider is DENIED.
BACKGROUND
Beginning in at least March 2004, Moncure listed his property located at 116 Plain Road in Wayland (“Wayland property”) for sale on the open market. Moncure received a preliminary offer for the Wayland property from Plain Road on March 18, and, after brief negotiations, the parties executed a Purchase and Sale Agreement (“P&S”) on or about April 1,2004. The agreed purchase price was $1.85 million. An attorney for Plain Road reviewed the P&S before the company’s manager, Douglas Stiles (“Stiles”), signed it. Upon execution and pursuant to Paragraph 20 of the P&S, Plain Road delivered a deposit in the amount of $91,500, i.e., 5% of the purchase price, to be held in escrow by the real estate broker, Coldwell Banker. Combined with the $1,000 deposit Plain Road submitted with its original offer, the amount placed in escrow totaled $92,500.
Coldwell Banker represented both parties in the sale of the Wayland property. Moncure retained Cold-well Banker in March 2004, under an exclusive listing agreement. While Moncure was personally acquainted with one of the Coldwell Banker agents, he had never previously done business with the brokerage firm. By contrast, Stiles and Coldwell Banker had an ongoing business relationship. Coldwell Banker had brokered real estate transactions for Stiles on several occasions prior to March 2004, and, during the period relevant here, it represented Plain Road in separate transactions unrelated to the Wayland property. One such transaction was the sale of property at 2 Old Colony Road in Weston (“Weston property”), the significance of which will soon be apparent.
Sale of the Wayland property was scheduled to close on June 30, 2004. Moncure coordinated an unrelated real estate transaction to close the same day, in which he was the buyer of a $900,000 property. In order to avoid financing the purchase, Moncure timed the two *600 deals so he could pay with cash from the proceeds of the Wayland property sale. However, prior to June 30, Moncure obtained a commitment letter from a bank to provide a $900,000 loan in the event the agreement with Plain Road fell through.
On June 29, one day before the scheduled closing, Plain Road notified Mon cure of its inability to close and proposed to postpone the closing date. No extension was agreed upon. It is not disputed that Moncure was ready, willing, and able to consummate the transaction on June 30. Plain Road, however, failed to appear at the closing. The parties discussed the possibility of a subsequent deal, but Plain Road never made another offer. Thereafter, citing Plain Road’s failure to perform according to their agreement, Moncure demanded release of the deposits held in escrow under the liquidated damages clause in the P&S. Paragraph 21 provides:
If the Buyer shall fail to fulfill the Buyer’s agreement herein, all deposits made hereunder by the Buyer shall be retained by the Seller as liquidated damages, as Seller’s sole and exclusive remedy, without further recourse hereunder, in equity or at law.
Coldwell Banker refused to comply with Moncure’s demand because Plain Road also claimed an entitlement to the funds. According to Plain Road, the liquidated damages clause in the P&S was legally unenforceable; hence, the deposits were buyer’s property which should be returned to it.[3] In spite of the dispute, Moncure allowed Coldwell Banker to continue representing him in connection with the Wayland Property. On August 9, 2004, Coldwell Banker did procure a third-party buyer for the Wayland Property for $1,895,000.
With the sale of Moncure’s property well behind it but the disagreement over the liquidated damages provision ongoing, Coldwell Banker maintained control over the escrow in the succeeding months. Meanwhile, Coldwell Banker continued to broker transactions on behalf of Plain Road, including the sale of the Weston property. When that deal closed on December 16, 2004, Plain Road could not pay the entire commission it owed Coldwell Banker from the proceeds of the sale. Therefore, Stiles executed a promissory note for the balance of $34,699. Coldwell Banker accepted the note, and, as security for the balance of the commission, took an assignment of all Plain Road’s “legal and equitable rights” to the deposits associated with Plain Road’s proposal purchase of the Wayland Property.
Coldwell Banker did not immediately disclose this arrangement to Moncure. Indeed, Moncure did not discover the assignment until January 19, 2005. At that time Coldwell Banker, still in possession of the disputed funds as Moncure’s escrow agent, revealed its newly-acquired adverse interest by proposing to its former client a settlement offer of $2,500 and threatening litigation in the alternative. Coldwell Banker attempted to relinquish control over the deposits in late October 2005, by setting up an account with Bank of America, shortly before it served Moncure with the complaint that began this case on November 2, 2005, but closed that account and had the funds transferred to its own counsel on December 1, 2005. The funds were not transferred to Moncure’s attorney until December 6, 2005 over a month after this suit was filed.
DISCUSSION
Defendant’s Motion to Strike
Coldwell Banker supplemented its Motion for Reconsideration (“Motion”) with copies of certain communications it possessed but did not produce when it opposed Moncure’s motion for summary judgment. These documents, contained in Exhibits A and C, reflect the dialogue between counsel for the parties beginning in January 2005, after Plain Road assigned Coldwell Banker its interest in the escrow account. The exhibits also contain a letter dated December 1, 2005 between Coldwell Banker and Bank of America, relating to an attempt to establish a new, independent account for the deposits. The correspondence, taken together, purports to demonstrate Coldwell Banker’s good faith while handling the disputed funds in its possession. Originally, no affidavit accompanied the Motion when Coldwell Banker served it on Moncure on July 7, 2008. Coldwell Banker did eventually serve a verifying affidavit on Moncure on July 25, and it filed the Motion and affidavit together with the Court on July 28.
The power to reconsider a case, issue, or question of law remains with the Court until it renders a final judgment. Peterson v. Hopson, 396 Mass. 597, 603-04 (1940). Reconsideration, expressly authorized under Massachusetts Rule of Civil Procedure 59(e) and Superior Court Rule 9D, has its roots in the inherent power of a trial court over the evidence before it. Sullivan v. Utica Mut. Ins., 439 Mass. 387, 401 (2003); see Fine v. Commonwealth, 312 Mass. 252, 255-56 (1942). Where there is no material change in circumstances, the Court is not bound to reconsider a case once decided. King v. Globe Newspaper Co., 400 Mass. 705, 707 (1987), cert. den., 485 U.S. 940 (1988). Nevertheless, the Court has a duty to do justice, and it should correct any error in an announced decision while it still has the power. Franchi v. Stella, 42 Mass.App.Ct. 251, 258, rev. den., 424 Mass. 1109 (1997). With respect to the correspondence in question, the language of Superior Court Rule 9D plainly contemplates that the Court may hear new evidence upon a motion for reconsideration.[4]
Summary Judgment
STANDARD OF REVIEW
Summary judgment shall be granted where there are no genuine issues of any material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Comm’r of Corr., 390 Mass. 419, 422 (1983); Cmty. Nat’l Bank v. *601 Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of demonstrating the absence of a triable issue, and that the summary judgment record entitles the movant to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Commc’ns Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. Gen. Motors Corp., 410 Mass. 706, 716 (1991).
LIQUIDATED DAMAGES CLAUSE
The Court granted summary judgment on Moncure’s claims relating to the liquidated damages provision of the P&S, declaring that he is entitled to receive the deposit as liquidated damages in accordance with Paragraph 21. Coldwell Banker does not advance any new evidence or arguments in the Motion. Rather, Coldwell Banker reiterates its belief that the question of when Moncure arranged for alternative financing constitutes a genuine issue of material fact precluding summary judgment. This argument is as unavailing now as it was before.
“It has long been the rule in Massachusetts that a contract provision that clearly and reasonably establishes liquidated damages should be enforced, so long as it is not so disproportionate to anticipated damages as to constitute a penalty.” TAL Fin. Corp. v. CSC Consulting, Inc., 446 Mass. 422, 431 (2006); see Kaplan v. Gray, 215 Mass. 269, 270-73 (1913). Whether a liquidated damages provision in a contract is enforceable is a question of law. NPS, Inc. v. Minihane, 451 Mass. 417, 419 (2008). Generally, a liquidated damages provision will be enforced when, at the time the agreement was made, potential damages were difficult to determine and the clause was a reasonable forecast of damages expected to occur in the event of a breach. Kelly v. Marx, 428 Mass. 877, 879 (1999).
The Supreme Judicial Court’s holding in Kelly is controlling here. The Kelly Court, considering a 5% deposit clause and a liquidated damages clause in a purchase and sale agreement similar to the P&S at bar, held that liquidated damages were a reasonable estimate of the damage caused by buyer’s failure to perform. Id. at 882. The Kelly Court also rejected the “second look” approach to determining the enforceability of a liquidated damages clause. Id. at 880. According to the Supreme Judicial Court, judges should assess reasonableness by examining only the parties’ ability to anticipate damages at contract formation, and never by taking a “second look” and considering the actual damages resulting from breach. Id. The holding in Kelly recognizes the usefulness of liquidating damages in real estate transactions, where so many unforeseeable factors can change the parties’ positions between the time of contract formation and the time of breach.[5]
The fact that Moncure took the precaution of obtaining a financing commitment for his purchase of the Weston property prior to Plain Road’s default on the Wayland property does not distinguish this case from Kelly. The costs of obtaining alternative financing was only one ingredient of Moncure’s total possible damages from a potential breach of the P&S, and anticipating one component of damages did not equate to anticipating the extent of all damages. As the Court observed in Kelly, real estate purchase and sale agreements are precisely the type of contracts that are amenable to liquidated damages provisions because the consequences of breach are especially unpredictable. Id. at 881-82, quoting Watson v. Ingram, 124 Wash.2d 845, 855 (1994) (“[T]he parties could not know what delays might ensue, what might occur in the real estate market, or how a failed sale might affect [the seller’s] plans”). Thus, while the Court recognizes that the evidence, viewed in light most favorable to Coldwell Banker, raises a question of fact regarding when Moncure obtained alternative financing, that question of fact is not a material one.
Coldwell Banker bears the burden of proving that the liquidated damages provision is unenforceable. See TAL Fin. Corp., 446 Mass. at 430. However, nothing in the record rebuts Moncure’s assertion that a 5% deposit is a norm in the real estate industry for a purchase and sale agreement.[6] Apart from ambiguous deposition statements made by Moncure, Coldwell Banker has offered nothing to show that damages from Plain Road’s failure to close on the Wayland property were particularly foreseeable, or that Moncure anticipated, or could have anticipated, those damages at the time the P&S was signed. Coldwell Banker simply has not produced evidence sufficient to raise a genuine issue of material fact. Therefore, Moncure is entitled to receive the deposit as liquidated damages in accordance with the express terms of the P&S.
G.L.c. 93A CLAIM
On Moncure’s motion for summary judgment, the Court determined that Coldwell Banker’s conduct related to the escrow account was unethical and unscrupulous. Unethical and unscrupulous acts in the commercial context may constitute a violation of G.L.c. 93A. See Wasserman v. Agnastopoulous, 22 Mass.App.Ct. 672, 679-80, rev. denied, 398 Mass. 1105 (1986). The Court found Coldwell Banker liable on these grounds.
Coldwell Banker now disputes the factual and legal bases for the Court’s ruling. For the first time in this action, Coldwell Banker raises the jurisdictional objection that Moncure failed to send a demand letter pursuant to G.L.c. 93A, §9(3). In addition, Coldwell Banker cites to agency law in its brief to show that there is no basis for the Court to find a continuing obligation to Moncure once Coldwell Banker brokered *602 the sale of the Weston Property. Finally, Coldwell Banker argues that the correspondence it submitted with the Motion demonstrates a course of conduct following the December 16, 2004 assignment that contradicts the Court’s findings of impropriety.
Chapter 93A prohibits unfair acts or practices by persons engaged in trade or commerce. G.L.c. 93A, §2(a). An act or practice violates the standard of §2(a) where it “(1) falls ‘within at least the penumbra of some common-law, statutory, or other established concept of unfairness,’ (2) it [is] unethical or unscrupulous, and (3) it causefs] substantial injury to a consumer or another businessman.” Wasserman, 22 Mass.App.Ct. at 679, quoting PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975). The three-part test is disjunctive as opposed to conjunctive; any one factor under the circumstances may be sufficient to find a violation. See Quincy Cablesystems, Inc. v. Sully’s Bar, Inc., 684 F.Sup. 1138, 1143 (D.Mass. 1988) (observing that the three elements were merely “factors to determine if the practice is unfair”).
A section 9 plaintiff must send a demand letter to the defendant as a condition precedent to filing suit. G.L.c. 93A, §9(3). The requirement is integral to the purposes and stricture of §9, and its satisfaction engenders jurisdiction in the Court to hear the claim. Rodi v. S. New England Sch. of Law, 389 F.3d 5, 19 (1st Cir. 2004). Consequently, the failure to plead and prove the sending of a demand letter is grounds for dismissal. See City of Boston v. Aetna Life Ins. Co., 399 Mass. 569, 574 (1987) (“[t]he failure of the City to allege the sending of a demand letter is fatal to its §9 claim”). However, §9 relieves a parly of the responsibility to send a demand letter when, as here, a c. 93 claim first arises in responsive pleadings. G.L.c. 93A, §9(3). There is thus no jurisdictional defect barring the Court from hearing Moncure’s §93A claim. Here, Moncure alleged the G.L.c. 93A violation as a counterclaim to Coldwell Banker’s action for declaratory judgment. The law clearly does not require Moncure to send a demand letter under these circumstances. See id. (“The demand requirements of this paragraph shall not apply if the claim is asserted by way of counterclaim or cross-claim . . .”). Whatever bearing Moncure’s failure to serve formal demand on Coldwell Banker may have on the equities of this case, the omission is irrelevant for purposes of the Court’s jurisdiction. Mechanics Nat’l Bank of Worcester v. Killeen, 377 Mass. 100, 110 (1979) (“Balancing the equities of the relationship of the parties [is] a major factor in determining unfairness”).
Turning now to the second argument in the Motion, the Court cannot oblige Coldwell Banker’s request to overlook the duty Coldwell Banker owed Moncure while it continued to hold the disputed deposit in escrow. Coldwell Banker relies on the general rule of agency that the obligations of an agent terminate when the purpose for which the agency was called into being is achieved. Mechem F., Agency §§552b, 553 (2nd ed. 1914). While Coldwell’s duty as Moncure’s real estate agent terminated when the Wayland property was sold, its duties as Moncure’s escrow agent continued as long as it held the escrow funds, which was until December 6,2005, almost ayear after the assignment. Although commonly conflated in the same transaction, the duties owed by real estate agents and the duties owed by escrow holders are separate and distinct. Kaarela v. Birkhead, 33 Mass.App.Ct. 410, 412 (1992); Restatement (Second) of Agency §14D app., reporter’s notes at 60 (1958) (“Although the escrow holder is not the agent of either of the parties, he is a fiduciary of both of them”). Coldwell Banker’s fiduciary duties as escrow holder, therefore, persisted for as long as it possessed the deposit on behalf of Moncure and Plain Road, regardless of when the underlying agency relationships ended. It would make little sense and lead to harsh results if an escrow holder’s obligations depended on the continued existence of an independent agency agreement with the parties.
Given the existence of fiduciary duties to the parties to escrow, Coldwell Banker breached that duly when it put its own interests in direct conflict with those of Moncure. In In the Matter of the Discipline of Two Attorneys, 421 Mass. 619 (1996), the Supreme Judicial Court explored the extent of an escrow holder’s obligation beyond the obvious obligation to carry out its terms. In that case, the escrow holders were two attorneys who represented a prospective purchaser of real estate and a judgment creditor of the seller. Discipline of Two Attorneys, 421 Mass. at 621-22. Without disclosing the dual representation and without notifying the seller, the attorneys deducted the judgment amount from the escrow account and conveyed it to the creditor before returning the balance to the seller upon closing. Id. The Supreme Judicial Court held,
Surely, self-dealing by an escrow holder . . . would be a breach of duty. We have no hesitancy in concluding that if, as was the case here, an escrow holder without disclosure sets in motion a process to deny a party to the escrow agreement a portion of the funds to be held in escrow . . . the escrow holder violates a fiduciary duty to that party to the escrow agreement.
Id. at 627. In this Court’s view, a real estate brokerage firm engages in self-dealing commensurate with the conduct the Supreme Judicial Court found offensive in Discipline of Two Attorneys when it takes an assignment of an interest in a disputed escrow it itself is holding.
Accordingly, the Court continues to conclude that Coldwell Banker’s breach of fiduciary duty “falls within at least the penumbra of some common-law, statutory, or other established concept of unfairness.” The circumstances attendant to that breach warrant a finding that Coldwell Banker did engage in an unfair *603 commercial practice in violation of G.L.c. 93A, §2(a). Coldwell Banker was aware it was acquiring an interest in disputed funds adverse to Moncure; it did not disclose the agreement to Moncure, a known interested party; the value of the escrow greatly exceeded the actual debt it secured; Plain Road and Coldwell Banker had historic and ongoing commercial dealings; and, considering Coldwell Banker’s actual possession of the disputed funds, the assignment gave the brokerage unfair leverage in settlement negotiations. Indeed, Coldwell Bankers offer to settle the dispute by paying Moncure a mere $2,500 and itself retaining the balance of the $92,500 escrow fund (more than 97%) can itself be viewed as unconscionable. In light of these facts, Coldwell Banker’s conduct qualifies as unethical and unscrupulous.
As for the other letters contained in the exhibits accompanying the Motion, the critical time period consists of the moment at which Coldwell Banker accepted the assignment and voluntarily assumed an adversarial position vis-a-vis the funds. Even if the letters demonstrated fair dealing in the months thereafter (which they do not) they would be largely irrelevant.
ORDER
For the foregoing reasons, it is hereby ORDERED that Moncure’s motion to strike, pursuant to Mass.R.Civ.P. 56(e) and Superior Court Rule 9A(a)(4), is DENIED, and that Coldwell Banker’s motion for reconsideration of the Court’s allowance of defendant’s motion for summaiy judgment (docket #8) is also DENIED.
Moncure shall serve, within twenty days, its motion for assessment of c. 93A damages, attorney fees and costs and shall file these, together with any opposition papers, pursuant to Rule 9A procedure, within forty-five days.

In the event of a disagreement between the parties, Coldwell Banker, as escrow agent and pursuant to Paragraph 20 of the P&S, was obligated to retain the deposits “pending instructions mutually given in writing by the Seller and the Buyer.”

“If, upon reviewing the motion and supporting documents, the Justice who decided the original motion desires to hold a hearing on the motion for reconsideration, he or she may schedule a hearing theron.” Superior Court Rule 9D.

For instance, a default can produce costs arising “from a host of issues relating to finding another buyer and waiting for an uncertain period of time before selling their property, and in light of the risk of an undeterminable loss that is dependant on many facts (primarily the shape of the real estate market at the time of the breach).” Kelly, 428 Mass. at 882.

As evidence, Moncure produced copies of Coldwell Banker’s own web page, which advises placing anywhere between 5% to 20% of the offer price in escrow to secure the offer.