**ELIAS BROTHERS RESTAURANTS, INC.,**

v.

**ACORN ENTERPRISES, INC., John W. Quilty, Patricia B. Hannon.**

Civ. A. No. 92–12340–Y.

United States District Court, D. Massachusetts.

Aug. 27, 1993.

Mary M. Born, Hill & Barlow and E. Randolph Tucker, Hill & Barlow, Boston, MA, for plaintiff.

Stephen Wald, Craig & Macauley, Boston, MA, for defendants.

## MEMORANDUM AND ORDER ON MOTION FOR LEAVE TO AMEND ANSWER TO ASSERT AFFIRMATIVE DEFENSES AND COUNTERCLAIMS (# 54)

COLLINGS, United States Magistrate Judge.

### I. INTRODUCTION

The instant lawsuit was commenced in late September, 1992.[1] In April of 1993, the plaintiff, Elias Brothers Restaurants, Inc. (hereinafter "Elias") moved for partial summary judgment on its breach of contract claim for failure to pay royalty fees against the corporate defendant, Acorn Enterprises, Inc. (hereinafter "Acorn") as well as the claim alleging joint and several liability against the individual defendants, John W. Quilty (hereinafter "Quilty") and Patricia B. Hannon (hereinafter "Hannon"). Opposing the dispositive motion, the defendants advanced arguments based upon defenses and counterclaims not previously alleged in their answer. To clarify the record, the Court issued a Procedural Order (# 52) directing the defendants to file a motion for leave to amend their answer if in fact they intended to assert those defenses and counterclaims.

In accordance with the Procedural Order, the defendants have duly filed a motion seeking leave to amend their answer in order to add both an affirmative defense of misrepresentation and a three-count counterclaim against Elias. The causes of action alleged in the proposed counterclaim are as follows: Count I, a claim for fraudulent inducement and misrepresentation; Count II, a claim for breach of contract; and, Count III, a claim for reformation, cancellation and/or rescission of the contract. Elias opposes the de-

---

1. The District Judge has referred the case to the undersigned United States Magistrate Judge for all purposes pursuant to 28 U.S.C. § 636(c) in accordance with the parties' consent.

fendants' motion on the ground that the proposed amendments fail to state claims upon which relief can be granted and, therefore, are futile.

Although the facts of this case have been recited at length in the Memorandum and Order on Motion of Elias Brothers Restaurants, Inc. for Partial Summary Judgment also rendered this date, in order to place the motion to amend in context, an abbreviated review is required. In the fall of 1989, Elias, the corporate franchisor of Big Boy restaurants, entered into three franchise agreements with Acorn[2] for the operation of Big Boy restaurants in Middleboro, Seekonk and Bourne, Massachusetts. Inter alia, the terms of these franchise agreements obligated Acorn to pay a percentage of the monthly gross sales of each restaurant to Elias as a royalty fee. Subsequent to November of 1989, only two partial franchise royalty payments were made by Acorn, which prompted Elias to send out a series of default notices. When the defaults were not cured, by letter dated August 20, 1991, Elias advised Acorn that the franchise agreements were terminated. Due to a variety of circumstances that need not be detailed, Acorn continued to operate the three restaurants under the Big Boy name until February of 1993 when Elias obtained a preliminary injunction compelling Acorn to de-identify the restaurants.

## II. *THE MOTION TO AMEND*

### A. **Fraudulent Inducement**

The primary claim that the defendants seek to interpose in their amendment by way of an affirmative defense and Count I of their counterclaim is one of fraudulent inducement. It is alleged that Elias made certain oral representations to the defendants upon which they relied in executing the franchise agreements and that those representations were false.

Under Massachusetts law, in order to establish a claim for fraudulent misrepresentation, it is incumbent upon a plaintiff to prove:

> . . . that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his detriment.

*Danca v. Taunton Savings Bank,* 385 Mass. 1, 8, 429 N.E.2d 1129, 1133 (1982) (citations omitted); *see also Turner v. Johnson & Johnson,* 809 F.2d 90, 95 (1 Cir., 1986). This standard has further been defined as requiring that the plaintiff's reliance upon the alleged misrepresentation be reasonable. *Saxon Theatre Corporation of Boston v. Sage,* 347 Mass. 662, 666–667, 200 N.E.2d 241, 244–245 (1964); *Kennedy v. Josephthal & Company, Inc.,* 814 F.2d 798, 805 (1 Cir., 1987).

As previously noted, the three franchise agreements between Elias and Acorn were executed in September, 1989. In their proposed counterclaim, the defendants identify essentially three misrepresentations purportedly made by agents of Elias to defendants Quilty and Hannon during meetings held in January and December of 1988.[3] First, Elias is alleged to have misrepresented its plans to expand the Big Boy restaurant chain. Specifically, according to the allegations of the proposed counterclaim:

> 7. In consideration of the payment of higher franchise fees, Elias Brothers represented that it was committed to expan-

---

**2.** Quilty and Hannon, each of whom was an officer of Acorn and owned an interest in the business, executed written guarantees personally guaranteeing Acorn's performance pursuant to the terms of the franchise agreements.

**3.** Elias is correct in arguing that the defendants' pleading utterly fails to meet the requirements of Rule 9(b), Fed.R.Civ.P., and could readily be dismissed for that reason. *See,* e.g., *Greenstone v. Cambex Corporation,* 975 F.2d 22 (1 Cir., 1992). However, it is quite clear that the allegations of the proposed counterclaim are premised upon the Affidavit of John W. Quilty (# 51) submitted in opposition to the motion for partial summary judgment. Indeed, in large measure the allegations are a verbatim reiteration of defendant Quilty's statements. Rather than engage in what would be a useless exercise, i.e., dismissal of the counterclaim for failure to plead fraud with particularity and granting leave to amend, to the extent necessary the defendants' fraud allegations shall be supplemented by the details incorporated in the Quilty affidavit.

sion of "Big Boy" restaurants in the New England area. Elias Brothers represented that it would concentrate efforts to expand east of Worcester and adjacent to the area served by Acorn's three restaurants. These representations were false.

8. Agents of Elias Brothers discussed the southeastern Massachusetts territory as an area to be exclusively for Acorn's use and development and the remaining eastern portion of Massachusetts, especially Boston and its western and northern suburbs, as an area which Elias would target for a future franchisee. Elias Brothers stated that it was talking to other prospective franchisees, including those who would like to develop in the east and northeast areas. These representations were false.

*    *    *    *    *    *

10. Elias Brothers never told Acorn that Abdow's, another franchisee, had a binding option to franchise the remainder of Massachusetts not already designated to either Abdow's or Acorn.

*    *    *    *    *    *

13. Elias Brothers did not undertake efforts to expand "Big Boy" franchises in the region. There has been *no* expansion, or even efforts at expansion, of "Big Boy" franchises in this area since the execution of the Franchise Agreements.

Motion for Leave to Amend, # 54, Exh. A, Amended Answer and Counterclaims.

The second subject about which Elias purportedly made misrepresentations was with respect to its ability to provide Acorn with goods at competitive prices. It is alleged that:

11. To induce Acorn to agree to pay higher franchise fees, Elias Brothers promised that the higher franchise fees would be at least partially offset by lower costs of goods made available through the Elias Brothers' commissary and distribution system. These representations were false.

12. Elias Brothers represented to Acorn that it would be able to assist Acorn in buying at a better price than they could on their own. Elias Brothers promised "one-step shopping", i.e., a complete ser-

vice including food, products, paperware, and smallwares, at its Commissary. These representations were false.

Motion for Leave to Amend, # 54, Exh. A, Amended Answer and Counterclaims.

The defendants contend that Elias "failed to fulfill its obligations" in that the commissary was unable to service Acorn's three franchised restaurants and that the other buying programs offered by Elias did not provide a complete package "which was competitive with Acorn's self-developed program." (# 54, Exh. A, ¶¶ 14, 15)

Lastly, Elias purportedly misrepresented the prospective uniformity that would be established at Big Boy restaurants. In this regard it is alleged:

9. Elias Brothers represented to Acorn that all current franchisees had agreed to drop their regional designations and go with common signage as "Big Boy" restaurants. This, they told Acorn, would increase name recognition and strengthen the "Big Boy" chain. Elias Brothers also represented that all franchisees would be adopting a universal menu in order to establish the uniformity across the country which was necessary to develop the chain and "Big Boy" identity. These representations were false.

Motion for Leave to Amend, # 54, Exh. A, Amended Answer and Counterclaims.

Paragraph 9 represents the entirety of the defendants' uniformity claim.

The defendants allege that Acorn entered into the three Big Boy franchise agreements relying upon these misrepresentations and, as a result, "suffered damages which damages, at a minimum, offset franchise fees allegedly due." (# 54, Exh. A, ¶ 19) Because Elias did not fulfill its purported obligations, Acorn's revenues allegedly did not rise to a level sufficient to offset the high franchise fees. (# 54, Exh. A, ¶ 16)

Based upon the Affidavit of John W. Quilty (# 51), it appears that the defendants were not novices in the franchise restaurant business. Acorn had purchased the subject three restaurants in October, 1987 from Marriott Corporation and, as part of the purchase, had

agreed to run the restaurants pursuant to a "Big Boy" franchise agreement with Marriott. (# 51, ¶ 2) Thus, the Elias franchise agreements were not the first to which Acorn was a party. It is also noted that the negotiations with respect to the franchise agreements at issue took place over a period of time, i.e., beginning with meetings and discussions in January of 1988 and continuing until the contracts were signed in the fall of 1989. (# 51, ¶¶ 8, 10, 12, 13, 15, 16) Indeed, the franchise agreements reflect that they were the product of negotiation as evidenced by the deletion of various provisions. (# 51, Exh A., ¶¶ 2, 5, 6, 11, 23C, 23G)

In its memorandum in opposition to the motion to amend, Elias argues that the defendants could not reasonably have relied upon any of the alleged prior oral representations in light of the written terms of the franchise agreements. The First Circuit has had occasion to construe Massachusetts law in addressing this precise argument in the case of *Turner v. Johnson & Johnson*, 809 F.2d 90 (1 Cir., 1986).

In *Turner*, following extensive negotiations, the parties entered into a written purchase and sale agreement for an electronic thermometer business. Several years after the final agreement was executed, the plaintiffs filed a lawsuit alleging that, during the course of the negotiations, the defendant made various misrepresentations and omissions of fact in order to induce them to sell the business at a very low price, thereby defrauding them. The jury found for the plaintiffs on their fraud claim, and the defendant appealed the denial of its motion for a new trial or judgment n.o.v.[4] Like Elias, the defendant in *Turner* contended that it was entitled to judgment as a matter of law on the fraud claim because the written purchase and sale agreement refuted the purported oral misrepresentations and, consequently, the plaintiffs could not establish reasonable reliance upon the earlier statements.

At the outset of its discussion, the First Circuit acknowledged the Massachusetts case precedent

... establishing that a party may not contract out of fraud. These cases involve the use of general disclaimers or integration clauses, ...; oral assertions in the face of contractual silence, ...; or other ambiguous language that was susceptible to the plaintiff's interpretation establishing fraud.

*Turner v. Johnson & Johnson, supra,* 809 F.2d at 95 (citations omitted).

Citing the seminal Massachusetts case of *Bates v. Southgate*, 308 Mass. 170, 31 N.E.2d 551 (1941), the Court noted the Massachusetts Supreme Judicial Court "recognized that a balance must be struck between two competing values: contractual certainty and protecting innocent parties from fraud." *Turner v. Johnson & Johnson, supra,* 809 F.2d at 95–6. The public policy of permitting avoidance of a promise procured by fraud is not to be circumvented "by means of contractual devices." *Id.* at 96 quoting *Bates v. Southgate, supra,* 308 Mass. at 182, 31 N.E.2d at 551.

Continuing its analysis, the First Circuit then wrote:

We have no doubt that the balance shifts when the party asserting fraud is not seeking to avoid an ambiguous or deceptive "contractual device[ ]," but is trying to reverse the precise terms of an agreement. When a contract contains an "as is" clause or other ambiguous language, the agreement is to some extent left undefined, and the plaintiff's understanding of the agreement logically may be colored by the defendant's prior statements, fraudulent or otherwise. Moreover, there is nothing on the face of the contract to trigger alarm. In such a case, barring a fraud claim would, in effect, allow parties to contract out of fraud.

In contrast, a contractual provision flatly contradictory to prior oral assurances should cause most people—and particularly experienced, knowledgeable businesspeople—to pause. Moreover, if a jury is allowed to ignore contract provisions directly at odds with oral representations allegedly made during negotiations, the language of a contract simply would not matter anymore. Even if a sales contract

---

4. There were several other claims in the case that are not relevant to the present discussion.

provided that the product for sale is old, the buyer could claim that she purchased it only because the seller said it was new. Contracts would become no more than presumptive statements of the parties' intentions, instead of legally enforceable agreements. And the give-and-take of negotiations would become meaningless if, after making concessions in order to obtain other contractual protections, a knowledgeable party is later able to reclaim what it had given away by alleging that it had, in fact, relied not on the writing but on the prior oral statements. Thus, in weighing the competing interests, the Massachusetts Supreme Judicial Court undoubtedly would find that the threat to contractual certainty usually would outweigh the possible injustice of denying a claim of fraud.

*Turner v. Johnson & Johnson, supra,* 809 F.2d at 96 (footnote omitted).

The dilemma faced by the First Circuit in *Turner,* however, was that the facts of the case fell in the gray area "between a flat contradiction and a vague general disclaimer." *Id.*

The *Turner* plaintiffs asserted, inter alia, that the defendant had promised to promote the electronic thermometer. The purchase and sale agreement included a provision stating that the defendant had no obligation to market the product. The oral representation and the contract provision did not necessarily conflict. Relying on the case of *Plumer v. Luce,* 310 Mass. 789, 39 N.E.2d 961 (1942) for guidance, the First Circuit concluded that

> ... where both parties were experienced in business and the contract was fully negotiated and voluntarily signed, plaintiffs may not raise as fraudulent any prior oral assertion inconsistent with a contract provision that specifically addressed the particular point at issue. While we do not condone misrepresentations in contract negotiations, we also reject the notion that courts or juries should rewrite a fully negotiated contractual agreement that so precisely sets out the rights and obligations of two sophisticated parties. We do not believe this rule of law awards undue protection against fraud claims. It means only that a knowledgeable buyer

should not sign a contract that conflicts with his or her understanding of the agreement.

*Turner v. Johnson & Johnson, supra,* 809 F.2d at 97–8.

This aspect of the plaintiffs' fraud claim thus was found to fail as a matter of law.

The franchise agreements in the instant case incorporate several pertinent provisions. First, there is an integration clause, which reads in relevant part:

> *Entire Agreement*—This Agreement contains the entire agreement between the parties; there are no representations, inducements, promises, agreements, arrangements or undertakings, oral or written, between the parties other than those set forth. No agreement of any kind relating to the matters covered by this Agreement shall be binding upon either party unless and until the same has been made in writing and executed by all interested parties.

Affidavit of John W. Quilty, # 51, Exh. A, ¶ 36.

With respect to counseling and advisory services, the agreements provide that "[u]pon request of the Franchisee, Franchisor may, as it deems appropriate ... furnish consultation and advice regarding the following services: ... (F) Advertising and promotion ...; (I) Purchasing and inventory control ...; (L) Menu planning; (M) Operation of a commissary ..." # 51, Exh. A, ¶ 7. Finally, there is a disclaimer clause, providing

> *Representations by Franchisee*—Franchisee represents, acknowledges and warrants to Franchisor that:
>
> A. Franchisee has been thoroughly advised with regard to the terms and conditions of this Agreement by counsel of Franchisee's own choosing;
>
> B. Franchisee has not received from Franchisor any representation of Franchisee's potential sales, expenses, income, profit or loss at the Franchised Unit;
>
> C. Franchisee understands that Franchisor makes no express or implied warranties or representations that Franchisee will achieve any degree of success in operation of the Franchised Unit and while

Franchisor will provide Franchisee with training, advice and consultation as provided in this Agreement, success in the operation depends ultimately on Franchisee and on other factors including, but not limited to, location, marketing, regional tastes and preferences, economic conditions, financial considerations and competition.

Affidavit of John W. Quilty, # 51, Exh. A, ¶ 32.

These franchise agreement provisions are clear, unequivocal and unambiguous. To the extent that the defendants, experienced in business, relied upon prior oral representations, their reliance was unreasonable as a matter of law. The language of the franchise agreements was more than sufficient "to trigger alarm"; any and all earlier oral promises or representations were expressly disclaimed. In particular, the success of the three restaurants was plainly not guaranteed.

Applying the *Turner* rationale in a franchise agreement case similar to the one at bar, the district court in the Southern District of New York rejected the plaintiffs' fraud claim, declaring "[t]he franchise agreement in the case at hand contains the kind of disclaimer which the First Circuit, applying Massachusetts law, held sufficient to defeat a fraudulent inducement claim in *Turner.*" *Rosenberg v. Pillsbury Company,* 718 F.Supp. 1146, 1153 (S.D.N.Y., 1989) (applying Massachusetts law). The Court cited three other Massachusetts district court opinions wherein, faced with comparable integration clauses and disclaimers in written franchise agreements, the judges dismissed fraud claims based upon alleged misrepresentations not incorporated in the contracts. *See Curry v. Steve's Franchise Co., Inc.,* 1985–1 Trade Cases (CCH) p. 66,421, 1984 W.L. 1468 (D.Mass., 1984); *TLH International v. Au Bon Pain Franchising Corp.,* [1986–87 Transfer Binder] Bus. Franchise Guide (CCH) p. 8787, 1986 W.L. 13405 (D.Mass., 1986); *Symes v. Bahama Joe's, Inc.,* 1988 W.L. 92462 (D.Mass., 1988).

The Massachusetts Supreme Judicial Court addressed an argument based on the *Turner* decision in *McEvoy Travel Bureau, Inc. v. Norton Company,* 408 Mass. 704, 563 N.E.2d 188 (1990). The SJC found, as a matter of fact, that *Turner* was "distinguishable from this case in at least two important respects." *Id.,* 408 Mass. at 710, 563 N.E.2d at 193. The distinctions were first, that the purported fraud in the *Turner* case occurred during the course of negotiations before the contract was executed and, second, "that the written contract represented the parties' complete and final understanding." *Id.,* 408 Mass. at 710–711, 563 N.E.2d at 193. Having explained these differences, the SJC then wrote:

Cases like this one are to be analyzed in light of the principles stated in *Bates [v. Southgate], supra,* while cases, generally similar to *Turner,* where there can be no reasonable reliance on the alleged misrepresentation, are to be analyzed under the principles stated in *Plumer v. Luce, supra.* We therefore see no reason to create, as *Turner* suggests, a new rule or an exception to fit cases between sophisticated business enterprises involving contracts which have been induced by the fraud of a party.

*McEvoy Travel Bureau, Inc. v. Norton Company, supra,* 408 Mass. at 713, 563 N.E.2d at 194.

The instant case is without doubt "generally similar to *Turner.* " The direct, precise terms of the franchise agreements serve as a bar to any reasonable reliance by the defendants on prior oral representations by Elias. As a matter of law, the defendants' fraud allegations fail to state a claim upon which relief can be granted.

It should also be noted that this conclusion is buttressed by the fact that in large measure, Elias' representations as alleged by the defendants consist of "opinions as to future events." *Schott Motorcycle Supply, Inc. v. American Honda Motor Company,* 976 F.2d 58, 64 (1 Cir., 1992). For example, it is alleged that Elias promised that it *would* concentrate efforts on expansion, that it *would* be able to assist Acorn in buying products at better prices, etc. Under Massachusetts law, " 'false statements of opinion, of conditions to exist in the future, or of matters promissory in nature are not actionable.' " *Saxon Theatre Corporation v. Sage, supra,* 347 Mass. at 667, 200 N.E.2d at 245 (citation

omitted); *Harris v. Delco Products*, 305 Mass. 362, 365, 25 N.E.2d 740, 742 (1940). Representations such as those allegedly made by Elias "in the context of franchisor-franchisee communications constitute nothing more than 'puffing' or 'trade talk,' upon which no reasonable person would rely." *Schott Motorcycle Supply, Inc. v. American Honda Motor Company*, *supra*, 976 F.2d at 65 (citations omitted). Again, the defendants could not have *reasonably* relied upon them.

### B. Breach of Contract

■ In Count II of the proposed counterclaim, the defendants basically repeat the fraudulent misrepresentation allegations and then characterize Elias' failure to fulfill these "obligations" as breaches of contract. The defendants do not identify any term or provision in the written franchise agreements that allegedly was breached perhaps for the obvious reason that none of the purported "obligations" were part of the contracts.

■ As recited hereinabove, the franchise agreements contained integration clauses. The rule in Massachusetts is that

[w]here the writing shows on its face that it is the entire agreement of the parties and "comprises all that is necessary to constitute a contract, it is presumed that they have placed the terms of their bargain in this form to prevent misunderstanding and dispute, intending it to be a complete and final statement of the whole transaction."

*Bendetson v. Coolidge*, 7 Mass.App.Ct. 798, 802–803, 390 N.E.2d 1124, 1127 (1979) (citations omitted).

There is no ambiguity with respect to the terms of the franchise agreements. The defendants' attempt to impose new and additional obligations upon Elias is barred by the parol evidence rule.

### C. Reformation, Cancellation and/or Recission

■ The final claim in the proposed counterclaim, Count III, seeks the equitable remedy of reformation, cancellation and/or rescission of the franchise agreements. The defendants allege that:

30. As described above, Elias Brothers made false representations to Acorn regarding the specific benefits it would provide to Acorn in consideration of Acorn paying Elias Brothers franchise fees.

31. As a result of the misrepresentations of Elias Brothers, the terms of the Franchise Agreements should, in equity and good conscience, be reformed, cancelled and/or rescinded to reflect the appropriate franchise fees relative to the benefits actually provided by Elias Brothers to Acorn.

Motion for Leave to Amend, # 54, Exh. A, ¶¶ 30, 31.

In his affidavit, defendant Quilty stated "[b]y January 1990, it had become clear to me that Elias made misrepresentations to us and was unable to fulfill its contract obligations." (Affidavit of John W. Quilty, # 51, ¶ 23) Further, it is undisputed that the defendants continued to operate their three restaurants as Big Boy franchises until forced by court order to de-identify in February, 1993.

■ It has long been the law in Massachusetts that " . . . a plaintiff seasonably may rescind a contract which he has been induced to enter into in reliance upon false and fraudulent representations as to material facts." *McGrath v. C.T. Sherer Co.*, 291 Mass. 35, 58, 195 N.E. 913, 925 (1935) (citations omitted). It has already been determined that the defendants in this case have no claim for fraudulent inducement. That point aside, however, it is clear as a matter of law that the defendants have not *seasonably* rescinded the franchise agreements.

■ Seeking an equitable remedy, "[a]ctions for rescission must be brought with reasonable promptness." *Solomon v. Birger*, 19 Mass.App.Ct. 634, 638, 477 N.E.2d 137, 141 (1985); *McNulty v. Whitney*, 273 Mass. 494, 500, 174 N.E. 121, 124 (1930). Massachusetts law provides that "[w]hat is a reasonable time depends on all the circumstances of the case." *Mathewson Corporation v. Allied Marine Industries, Inc.*, 827 F.2d 850, 853 (1 Cir., 1987) quoting *Powers, Inc. v. Wayside, Inc. of Falmouth*, 343 Mass. 686, 691, 180 N.E.2d 677 (1962); *Charles River Park, Inc. v. Boston Redevelopment*

*Authority,* 28 Mass.App.Ct. 795, 814, 557 N.E.2d 20, 32 (1990). Moreover,

> [w]here the evidence is in dispute and open to different inferences, the question whether an act has been done within a reasonable time after the happening of a certain event is ordinarily a question of fact, but where ... the facts are not in dispute the question becomes one of law.

*Powers, Inc. v. Wayside, Inc. of Falmouth, supra,* 343 Mass. at 691, 180 N.E.2d at 680 (citations omitted); *Charles River Park, Inc. v. Boston Redevelopment Authority, supra,* 28 Mass.App.Ct. at 814, 557 N.E.2d at 32.

The defendants admit to having knowledge of Elias' alleged misrepresentations in January of 1990, and yet they continued to reap the benefits of the franchise agreements and operate their businesses as Big Boy restaurants for a period of over three years. It is beyond cavil that the defendants have not come close to exercising "reasonable promptness" in asserting their claim for rescission. Indeed, their actions can only reasonably be viewed as having affirmed the franchise agreements. In this regard, for instance, after January of 1990, the defendants made at least two partial payments of royalty fees and continued to submit required monthly reports to Elias. In short, the defendants' claim for rescission and/or reformation must fail.

### III. *CONCLUSION AND ORDER*

For all the reasons stated, the defendants' proposed counterclaims and affirmative defense of misrepresentation are untenable. It is ORDERED that the defendants' Motion for Leave to Amend Answer to Assert Affirmative Defenses and Counterclaims (# 54) be, and the same hereby is, DENIED.