# United States Court of Appeals
## For the First Circuit

No. 10-1746

KENNETH EDLOW,

Plaintiff, Appellant,

v.

RBW, LLC,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lipez, Circuit Judge,
Souter,[*] Associate Justice,
and Howard, Circuit Judge.

Diane Rubin, with whom Jeffrey J. Pyle, Joshua A. Lewin and Prince, Lobel, Glovsky & Tye LLP were on brief, for appellant.
Richard D. Batchelder, Jr., with whom William J. Dunn and Ropes & Gray were on brief, for appellee.

August 8, 2012

---

[*]Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**HOWARD, Circuit Judge**.  This action, removed from Massachusetts Superior Court, involves residential condominium units in a development along Boston's Battery Wharf.  Plaintiff Kenneth Edlow appeals the 12(b)(6) dismissal of his suit against the developer RBW, LLC, in which he sought to rescind his purchase of a condominium unit, to recoup his deposits on a second unit, and to recover damages.  Mr. Edlow also appeals the district court's denial of his motion to amend his complaint.

## I.

As presented in the complaint and documents incorporated therein, the facts alleged are as follows.[1]  In the fall of 2004, Edlow entered into three nearly identical purchase and sale ("p & s") agreements with RBW for the purchase of three residential condominium units in RBW's Battery Wharf Development project.  The Master Deed and Condominium Documents explained that the project was a luxury development consisting of a Residential Unit (which included Edlow's units at issue here), a Commercial Unit, and a Hotel Unit (the "Hotel").  At the time that the p & s agreements were executed, it was anticipated that the Regent Hotel group would operate the Hotel as the "Regent Boston," and the residential unit occupants would have privileged access to the Hotel's "first-rate"

---

[1]  These documents include "RBW's marketing materials [including the Condominium Presentation], the condominium documents [including the Master Deeds of Battery Wharf Master Condominium, the Residences Condominium, and the Commercial Condominium], and the Purchase and Sale Agreements."

amenities and concierge services. According to the marketing materials that Edlow received from RBW, the Regent Boston was to offer an 18,000 square foot Guerlain spa, over 5,000 square feet of meeting space, and a signature restaurant by Michelin chef Guy Martin. The hotel services were to include 24-hour concierge service and an executive business center.

Edlow's closings were scheduled to take place by June 2007, with prices set at $1,800,000 for the first unit and $3,200,000 for each of the other two units. Over an eighteen-month period beginning when the p & s agreements were entered into in 2004, Edlow paid promised deposits of varying amounts in three installments, totaling twenty percent ($1,640,000) of the combined purchase price.

When construction on the project fell behind, RBW exercised its rights to extend the closing dates several times. Concerned by this anemic progress, Edlow visited the site in April 2008. It was clear to him during that visit that the Hotel was not yet ready and that no restaurant or spa yet existed. RBW representatives nevertheless assured him that the project was proceeding and that "all promised amenities would be available."

During the next month, the parties negotiated a revised agreement. Under this new agreement, Edlow would affirm his commitment to purchase two of the units. He would be released from the obligation to buy one of the more expensive units, and it was

agreed that his $640,000 deposit on that unit would be put toward the imminent purchase of the first of the two remaining units. The new agreement contemplated that the parties would close on the sale of the second remaining unit on August 15, 2008 and that they would otherwise perform under the terms of the prior agreements. The closing for the first unit took place on May 15, 2008.

In early June, RBW informed Edlow in writing that Regent was pulling out of the project and that the restaurant and spa were now scheduled to open in early 2009. In early July, RBW also informed him that the replacement hotel would not offer the property management and concierge services that were discussed in the original marketing materials. Despite having received these notices, Edlow executed the new agreement on July 27, 2008.

Days later, Edlow notified RBW that he would not attend the scheduled August 15 closing on the second unit, and he demanded the return of his deposits on that unit. He now justifies his withdrawal by arguing that at the time, the project was far from completion. He emphasizes that it had no hotel or hotel operator, no spa, no restaurant, no business center, "nor any of the other elements of the promised package of lifestyle amenities."

After the passage of several months, Edlow reasserted his demand for the return of his deposits on the second unit. In November 2009 he sued in Massachusetts state court. He alleged that as of the date of his complaint, "RBW had still failed to

-4-

deliver the complete package of promised amenities and lifestyle commitments for Battery Wharf." The complaint did not specify which amenities and lifestyle commitments had yet to be delivered, but it did allege that RBW knew at the time of Edlow's April 2008 site visit that the hotel, restaurant, and spa would not be ready by the scheduled August closing because Regent was no longer involved in the project. The complaint asserted that RBW intentionally and negligently misrepresented the project's status to induce him into agreeing to purchase the remaining units under the new agreement. In addition, Edlow alleged that RBW violated the "notice and delivery" requirements of § 9(3) of the p & s agreement by failing to timely inform him of "secret," "substantive" modifications to the Master Deed of the Battery Wharf Condominium.[2]

Based on these allegations, Edlow's suit asserted various contract, tort and statutory claims, and it sought both damages and equitable relief, including rescission of his purchase of the first unit. RBW removed the case to federal court and sought dismissal. Shortly after a hearing on the motion to dismiss, Edlow sought leave to amend his complaint to "clarify and expand upon the factual bases of that claim." The district court granted RBW's

---

[2] The modifications include the addition of "three prime, valuable waterfront patio areas to the limited common areas under the control, and for the exclusive use of, the Hotel Unit, at the expense of the amenities and value of the residential condominiums."

motion to dismiss and denied the motion to amend as moot. This appeal followed.

## II.

Review is de novo, and our "sole inquiry . . . is whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiff[], the complaint states a claim for which relief can be granted." Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 7 (1st Cir. 2009); see also Fed. R. Civ. P. 12(b)(6) (providing review for failure to state a claim). In making our inquiry, we are "not wedded to the lower court's rationale and may affirm the district court's order of dismissal on any ground made manifest by the record." Decotiis v. Whittemore, 635 F.3d 22, 28 (1st Cir. 2011) (internal quotation marks omitted). Although Edlow is not required to provide detailed factual allegations "to provide the grounds of his entitlement to relief," he must articulate "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations omitted). Because jurisdiction is based on diversity, 28 U.S.C. § 1332, we look to Massachusetts law for the elements of Edlow's claims. See Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co., 547 F.3d 48, 51 (1st Cir. 2008).

## A. Breach of Contract

The breach of contract claims were properly dismissed because the complaint does not plausibly plead a breach of any contractual duty. The plaintiff's position is that RBW "was unwilling or unable fully to perform" its contractual obligations; that it failed to provide certain amenities allegedly promised as part of the bargain; and that it "engag[ed] in a pattern of obfuscation and misrepresentation concerning the status of the project[] and its delays and setbacks." Edlow also says that RBW "made substantive modifications to the Master Deed" of the overall condominium without the notice called for by § 9(e) of the p & s agreements.

### 1. The Allegedly Promised Amenities

Edlow's position is that RBW had a duty to provide certain promised amenities. In making this claim, the complaint refers to not only the p & s agreement,[3] but also to the marketing materials, to oral statements made by RBW representatives, and to the Condominium Presentation's incorporated materials.[4] Of the

---

[3] For ease of exposition, we sometimes refer to the p & s agreements in the singular where the agreements contain identical provisions.

[4] As described in section 9(a) of the p & s agreement, the Condominium Presentation consisted of "(i) the current forms of the Residences Condominium Documents, the Master Condominium Documents, the Commercial Condominium Documents, the Deed and the Parking Documents, (ii) a proposed estimated budget for the Residences Condominium for its initial year of operation, (iii) the Project Outline Specifications; (iv) the form of Certificate of Limited

documents and communications referred to in the complaint, however, only the marketing materials and the alleged oral statements by RBW representatives discussed specific details of alleged promised amenities (e.g., a "Guerlain" spa, in contrast to a hotel spa; a "three-star Michelin" restaurant, rather than a hotel restaurant; and a "Regent" hotel, instead of a generic four-star hotel). But neither the marketing materials nor the oral statements were incorporated into the p & s agreement, and that agreement contains an unambiguous merger clause preventing their consideration. See Sound Techniques, Inc. v. Hoffman, 737 N.E.2d 920, 924 (Mass. App. Ct. 2000) (agreed upon and unambiguous merger clauses are effective unless fraud or deceit induced the contract, and thus they apply notwithstanding negligent oral misrepresentations). The primary merger clause reads as follows:

> The terms of this Agreement, together with the Condominium Presentation, constitute the entire agreement between the parties hereto and no statements made whether orally or in writing, by anyone with regard to the transaction which is the subject of this Agreement shall be construed as a part hereof unless the same be incorporated herein by writing and signed by Seller and Buyer. Buyer has relied only upon the warranties and representations set forth in this Agreement, if any, and Buyer hereby waives, to the extent permitted by law any and all implied warranties. <u>No oral warranties, representations or statements shall be considered a part hereof</u>.

Warranty for the Unit and Common Area Limited Warranty Certificate; (v) the form of Tax Letter Agreement; (vi) the form of the 6(d) certificates and Parking Unit expense certificate; and (vii) a Specimen Owner's Title Insurance Policy and related title information."

-8-

P & s agreement § 21 (emphasis added); see also id. § 9(b) ("Seller expressly disclaims any representations and warranties not expressly made in this Agreement in writing concerning the condition of the Unit or common areas and facilities . . . or any other matter . . . ." (emphasis added)); id. § 9(d) ("Other than as expressly set forth in this Agreement, . . . Buyer is not aware of and does not rely upon any such representations."); id. § 16(b) ("The foregoing warranties shall constitute the only warranties . . . . Seller makes no other warranty or representation whatsoever or implied with respect thereto." (additional emphasis omitted)).

This unambiguous merger language and the fact that the p & s agreement makes no mention of the marketing materials, either directly or by incorporation through the Condominium Presentation, place whatever those materials might say about the allegedly promised amenities beyond the contractual obligations of RBW.

Nor can the additional written terms of the p & s agreement and the Master Deeds save this claim. Although the agreement references the Commercial and Hotel Units, it does not specify amenities to be included within those units, let alone any particular level of any amenity. Section 7 of the agreement describes what "Necessary Facilities" RBW does agree to "substantially complete[]" by the closing date and what parts of

the project may not be completed by the closing date,[5] but nowhere does that section discuss amenities such as a three-star Michelin restaurant or a Guerlain spa.

The p & s agreement also provides, in § 7(d), that the "Buyer may not refuse to consummate Closing on account of construction work in progress or pending with respect to other units and/or the common areas and facilities . . . ." According to the complaint, two of the amenities that he was most concerned about -- the Michelin restaurant and Guerlain spa -- were pending at the time of the scheduled closing, as RBW had stated that they were scheduled to open in early 2009; therefore, they could not have been grounds for refusing to close.[6]

The Condominium Presentation, by means of the explicitly incorporated Master Deeds, mentions some amenities in general terms, but it does not promise to provide specific amenities. Rather, the Deeds discuss amenities in the broader, and negative, context of reserving RBW's rights to include certain types of

---

[5] This section of the p & s agreement defines "Necessary Facilities" as "the Unit, and the common areas and facilities necessary for access thereto and use thereof . . . ." Parts that RBW is not obligated to complete are described as including those whose "incompleteness . . . will not unreasonably prevent the occupancy of the Unit or use of the Necessary Facilities," and "finishes in hallways and lobbies need not be completed until unit construction on the floor on which the Unit is located is completed."

[6] The record indicates that both the Michelin restaurant and a hotel actually opened at least ten months prior to the filing of Edlow's complaint.

-10-

amenities within the project.[7]  The Deeds' language conveys an intention to authorize RBW to use the Commercial and Hotel Units for such amenities, but it does not state RBW will provide particular amenities.

Where there is no obligation to provide under a contract, there can be no breach of that obligation.  Accordingly, Edlow's claims of breach that rest on the allegedly promised amenities necessarily fail.

**2. Changes to the Master Deed**

The complaint also alleges that RBW breached § 9(e) of the p & s agreement by substantively modifying the Master Deed of the Master Condominium to add patios to the limited common areas of the Battery Wharf complex for the exclusive use of the Hotel Unit,

---

[7] Section 8(a) of the Master Deed of the Master Condominium provides that "[t]he Building and the Master Units <u>may</u> be used for any lawful purpose not otherwise prohibited by the terms and provisions of this Master Deed, . . . including, without limitation, use for a hotel (including restaurants, bar and meeting rooms), spa, health or fitness club, restaurants, parking garage . . . and retail facilities, multi-family residences and time-share hotel units." (Emphasis added).  In addition, § 8(b)(8) restricts the uses of the Commercial Unit, stating that it "shall be used <u>only</u> for restaurants and food service, retail facilities selling goods (but not services) at retail, spa, health or fitness club and parking garage . . . and uses accessory thereto." (Emphasis added).  Similarly, § 8(a) of the Master Deed of the Commercial Condominium states that "[t]he portion of the Building constituting the Commercial Condominium and the Units are <u>intended</u> to be used primarily for hotel (including restaurants, bar and meeting rooms), spa, health or fitness club, restaurants, parking garage . . . and retail facilities and related purposes not otherwise prohibited by the terms and provisions of this Master Deed . . . ." (Emphasis added).

and that RBW did this without giving the plaintiff required notice.

Section 9(e) of the p & s agreement states in relevant part:

> The Seller reserves the right, <u>upon notice and delivery</u> <u>of a copy to Buyer</u>, <u>prior to the Closing Date</u>, to make such modifications, additions or deletions in or to any of the Residences Condominium Documents, Master Condominium Documents, Deed or Parking Documents as Seller may <u>reasonably</u> determine to be desirable in connection with the development and marketing of the Project or to meet the requirements of any applicable law or regulation, . . . provided that no such modification, addition or deletion shall (i) impose any additional restrictions on the use of the Unit; (ii) require a <u>material</u> physical modification of the layout, location, size or features of the Unit; or (iii) eliminate the right to use any area designated for the exclusive use of the Unit.

(Emphasis added).  Section 15 states that "[a]ny notice . . . shall be in writing and shall be deemed to have been properly given when mailed, . . . or when hand delivered or sent by a recognized overnight courier service, or when sent by facsimile by confirmed transmission . . . ."

Whatever the plaintiff's frustration with these changes, we do not see how they were impermissible under § 9(e):  they do not "impose any additional restrictions on the use of [his units]"; "require a material physical modification of the layout, location, size or features of [his units]"; or "eliminate the right to use any area designated for the <u>exclusive</u> use of [his units or the Residential Unit as a whole]."  (Emphasis added).  Furthermore, sections 5(d), (e) and (f) of the p & s agreement are consistent with RBW's right to burden the master deeds and to modify its

-12-

obligations under those deeds upon proper notice to buyers. Those sections provide that RBW's promise to convey the individual unit deeds in the form presented in the Condominium Presentation, as well as free from liens and encumbrances, is subject to "the rights, obligations, easements and restrictions and all other provisions contained in" the master deeds (and related by-laws and regulations) of the Master Condominium, Residences Condominium, and Commercial Condominium.

The question, at least so far as concerns the unit as to which the closing never took place, is whether the complaint plausibly alleges that RBW failed to meet its obligation to "noti[fy] and deliver a copy" of the modifications to Edlow prior to the scheduled closing. We conclude that it does not. First, Edlow does not assert that he never received a copy of the modified Master Deed.[8] Rather, he argues that he was not effectively notified, for the "modifications were obscurely buried in the text of the Master Deed . . . and the accompanying plans and were not clearly featured or otherwise mentioned to [him]." But this constructive non-delivery argument ignores the definition of satisfactory notice included in § 15 of the p & s agreement, which

---

[8] The parties enthusiastically dispute whether Edlow received a copy of the modified Master Deed in conjunction with the purchase of the first unit. The complaint, however, does not allege that Edlow never received a copy, and he did not attempt to correct this alleged misinterpretation by clarifying the facts in his proposed Amended Complaint.

states nothing about having to "feature[] or otherwise mention[]" to him the individual changes in order to effectuate notice; it simply calls for "a copy . . . of the . . . Documents" that have been modified to be delivered to him.

Second, the closing was not scheduled to occur until August 15, and under § 9(e) RBW's obligation was only to notify Edlow of the modifications before that date.  Id. § 9(e) ("notice and delivery" must occur "prior to the Closing Date" (emphasis added)).  Even were we to assume that Edlow did receive a copy of the modified Master Deed in conjunction with the closing on the first unit but that such delivery did not satisfy the notice requirements of § 9(e) regarding the closing on the second unit, at the time that Edlow balked RBW still had an entire week remaining to act before it would have been in breach.  The plaintiff cannot now successfully complain that RBW breached its notification obligations under § 9(e) because it failed to act before a closing that he effectively cancelled.  Although, on a motion to dismiss, we review "the well pleaded facts in the light most favorable to the plaintiff, we need not 'swallow [his] invective hook, line, and sinker.'"  Palmer v. Champion Mortgage, 465 F.3d 24, 28 (1st Cir. 2006) (citing Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996)).  Because the complaint does not plausibly allege that RBW failed to honor its duty to provide notice under § 9(e) prior to the aborted

-14-

closing on the second unit, no claim of a breach of § 9(e) has been stated as to that unit.

The claim with respect to the unit on which Edlow did accept delivery of title also, as noted in footnote 8 above, amounts to a challenge to the adequacy of the notice received, rather than an allegation that no notice was given. But again the agreement did not require any highlighting, featuring, or any specific mentioning of the changes made. Whether or not there is a conceivable case for relief, this is not a plausible one, and thus the complaint similarly fails to state a claim regarding this unit. Sepúlveda-Villarini v. Dep't of Educ. of P.R., 628 F.3d 25, 29 (1st Cir. 2010) ("The make-or-break standard . . . is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief.").[9]

---

[9] Along with his breach of contract claims, the plaintiff also seeks to rescind his purchase of the first unit. Massachusetts expects actions for rescission to "be brought with reasonable promptness," Elias Bros. Rests., Inc. v. Acorn Enters., Inc., 831 F. Supp. 920, 927-28 (D. Mass. 1993) (internal quotation marks and citation omitted), yet the plaintiff waited almost a year and a half from the time that he purchased the first unit to file his claims. Moreover, he has not averred that the p & s agreement for either unit lacked consideration or that RBW had repudiated it. See Worcester Heritage Soc'y, Inc. v. Trussel, 577 N.E.2d 1009, 1010 (Mass. App. Ct. 1991) ("There is ample authority for refusing rescission where there has been only a breach of contract rather than an utter failure of consideration or a repudiation by the party in breach."). Having failed to state even a breach claim as to either unit, Edlow is not entitled to rescission as a remedy.

-15-

**B. The Covenant of Good Faith and Fair Dealing**

Edlow argues that RBW breached the covenant of good faith and fair dealing by "fail[ing] to construct and deliver the promised facilities and amenities for the Battery Wharf Development," by refusing to return his deposits on the second unit that it had retained as liquidated damages, by withholding critical information, and by modifying the umbrella Master Deed without giving proper notice under the p & s agreement.

In Massachusetts, "every contract is subject to an implied covenant of good faith and fair dealing," Anthony's Pier Four, Inc. v. HBC Assocs., 585 N.E.2d 806, 821 (Mass. 1991), but "[t]he scope of the covenant is only as broad as the contract that governs the particular relationship." Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 684 (Mass. 2005); see also Uno Rests., Inc. v. Boston Kenmore Realty Corp., 805 N.E.2d 957, 966 (Mass. 2004) ("[T]he covenant of good faith and fair dealing is not to supply contractual terms that the parties are free to negotiate."). As explained above, RBW did not have a contractual duty to provide Edlow's desired lifestyle amenities by the closing date. Because RBW was not obligated under the contract to provide the amenities, it could not have breached the covenant as to them, and the claims regarding them necessarily fail.

Edlow also alleges that RBW violated the covenant of good faith and fair dealing by retaining his deposits as liquidated

damages. That action, however, was expressly permitted by the agreement. Without a plausible allegation of bad faith, this claim stumbles. Equipment & Sys. for Indus. Inc. v. Northmeadows Constr. Co., 798 N.E.2d 571, 575 (Mass. App. Ct. 2003) (dismissing covenant claim under Rule 12(b)(6) because "there is nothing in the complaint from which one might draw the reasonable inference that the [alleged breach] was done in bad faith").

Similarly, with respect to the modifications of the Master Deed, not only is no plausible breach of contract alleged on the face of the complaint, but also the complaint articulates no "dishonest purpose, consciousness of wrong, or ill will." See id. The only potential allegation of bad faith -- and it is more implied than stated -- is that RBW knew that Regent was pulling out of the project months before RBW notified the plaintiff of that change. But Edlow has not linked this one possible allegation of a failure to share knowledge to any known duty, contractual or otherwise. Without more, this conclusory allegation does not survive. See Twombly, 550 U.S. at 555; see also Bank of Am., N.A. v. Prestige Imports, Inc., 917 N.E.2d 207, 218 (Mass. App. Ct. 2009) (quoting Spiegel v. Beacon Participations, Inc., 8 N.E.2d 895 (1937)) ("'[Bad faith] is not simply bad judgment. It is not merely negligence. . . . It implies conscious doing of wrong. It means a breach of a known duty through some motive of interest or ill will.'"); see also id. ("Massachusetts law has consistently

defined 'bad faith' with a . . . focus on the subjective, specifically on knowing and purposeful misbehavior.").

## C. Misrepresentation

The complaint alleges that RBW's statements in 2008 concerning the status of the project and associated amenities, as well as its acts and omissions during that period, "constitute intentional and/or negligent misrepresentation." Allegedly, Edlow relied on these statements to his detriment, in that he was induced by them into purchasing the first unit and executing the new agreement.

In Massachusetts, proof of misrepresentation "requires that a plaintiff show a false statement of material fact made to induce the plaintiff to act and reliance on the false statement by the plaintiff to his detriment." McEneaney v. Chestnut Hill Realty Corp., 650 N.E.2d 93, 96 (Mass. App. Ct. 1995); see also Cummings v. HPG Int'l, Inc., 244 F.3d 16, 21 (1st Cir. 2001) ("[The] threshold determination for any misrepresentation claim, be it for deceit or for negligent misrepresentation[] [is that] only statements of fact are actionable; statements of opinion cannot give rise to a deceit action or to a negligent misrepresentation action."). Furthermore, a plaintiff must show reasonable or justifiable reliance on the allegedly injurious representation. See Cumis Ins. Society, Inc. v. BJ's Wholesale Club, Inc., 918 N.E.2d 36, 47 (Mass. 2009) (holding that intentional

misrepresentation plaintiff must establish he "<u>reasonably</u> relied on the representation as true" (emphasis added)); <u>Nota Constr. Corp.</u> v. <u>Keyes Assocs.</u>, 694 N.E.2d 401, 405 (Mass. App. Ct. 1998) (holding that negligent misrepresentation plaintiff "must prove that the defendant . . . supplies false information . . . causing and resulting in . . . loss . . . by their <u>justifiable</u> reliance upon the information" (emphasis added)). The alleged misrepresentations that Edlow complains of are statements and promises allegedly made in the context of negotiating the new agreement, but that were not included either in that written agreement or in the underlying p & s agreement. For the reasons already discussed, we have concluded that none of these documents incorporate any actionable promises or oral statements from RBW regarding the amenities or their status. In the context of merger doctrine applicable to this case then, the plaintiff's alleged reliance on such statements would have been neither reasonable nor justifiable.

Moreover, as to the second unit, Edlow cannot argue that he reasonably relied upon Regent's continued participation when he signed the new agreement to purchase that unit, because he signed that agreement <u>after</u> he had received notice of Regent's withdrawal, the lack of concierge services, and the fact that the restaurant and spa would not be ready until 2009.

## D. Liquidated Damages

Edlow argues that the liquidated damages provision in the p & s agreement, which provided for up to twenty percent of the purchase price to be kept as liquidated damages,[10] was not a reasonable forecast of damages and was so unconscionably excessive as to constitute a penalty. On the record before us, we disagree with him that this count should have survived the motion to dismiss.

The reasonableness vel non of a liquidated damages provision involves a question of law, see NPS, LLC v. Minihane, 886 N.E.2d 670, 673 (Mass. 2008), and such "provisions will be enforceable so long as 'at the time the agreement was made, potential damages were difficult to determine and the clause was a reasonable forecast of damages expected to occur in the event of a breach.'"[11] NRT New England, Inc., v. Moncure, 937 N.E.2d 999, 1002

---

[10] The p & s agreement's liquidated damages provision, § 18, states that "[i]f Buyer shall fail to fulfill any of Buyer's agreements herein, the Deposits shall be paid to Seller and retained as complete and final liquidated damages and neither party shall have any further recourse to the other."

[11] Addressing the purpose of liquidated damages in a real estate context, the Massachusetts Supreme Judicial Court has underscored that "[r]eal estate purchase and sale agreements are precisely the type of contracts that are amenable to liquidated damages provision," for "the parties could not know what delays might ensue, what might occur in the real estate market, or how a failed sale might affect [the seller's] plans." Kelly v Marx, 705 N.E.2d 1114, 1117 (Mass. 1999) (citation omitted). We need go no further to conclude that damages here were difficult to determine ex ante.

(Mass. App. Ct. 2010) (quoting Kelly v. Marx, 705 N.E.2d 1114, 1115 (Mass. 1999)); see also Restatement (Second) of Contracts, § 356(1) (1979) (holding that liquidated damages must be "reasonable in the light of the anticipated or actual loss," and "[a] term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy").

There is no "bright line separating an agreement to pay a reasonable measure of damages from an unenforceable penalty clause." TAL Fin. Corp. v. CSC Consulting, Inc., 844 N.E.2d 1085, 1093 (Mass. 2006). Pointing to Massachusetts cases, Edlow says that drawing any line requires an examination of the factual context. See, e.g., Honey Dew Assocs., Inc., v. M & K Food Corp., 241 F.3d 23, 28 (1st Cir. 2001) (holding that "[d]etermining the validity of a liquidated damages clause is usually a fact-specific exercise[,]" and courts should inform their determinations of reasonableness with "an understanding of the factual predicates for the liquidated damages clause"). None of the cases he cites, however, hold that dismissal is improper in the absence of facts alleged in the complaint that would support a finding of unreasonableness, and Edlow's complaint does not contain such allegations.

Beyond a conclusory assertion that the liquidated damages amount is not reasonably related to anticipated damages, the complaint alleges no facts to support that conclusion. Indeed, the

-21-

only potentially relevant facts alluded to in the complaint suggest, if anything, that the forecast was not unreasonable. The complaint alleges that a representative of RBW was quoted in the Boston Globe newspaper as saying that the units were expected to bring in "an average price per square foot of $1,150, record territory for Boston real estate" and that the project was to "equal the Mandarin Oriental in condo finishes, services, and in exclusivity." This allegation suggests that the high-end, luxury units were aimed at a limited and distinctive market of financially capable prospective owners and investors. An inference that naturally follows is that RBW might encounter difficulties in moving units placed back into inventory after a breach, and no facts have been alleged suggesting otherwise.

In addition to the alleged facts suggesting an exclusive market, we also note that the anticipated sales involved pre-construction commitments to purchase units that would not be completed for at least two years. This extended time frame is reflected in the staggered structure of the deposits. Contrary to the inferences that the plaintiff would have us draw, the liquidated damages provision did not call for automatic retention of a twenty percent deposit. Rather, the provision contemplated three separate deposits to be submitted over the course of eighteen months. If Edlow had breached within six months of signing the p & s agreement, then RBW would have been entitled to retain only the

first five percent deposit as liquidated damages, a measure that Massachusetts courts have routinely found to be reasonable. See, e.g., NRT New England, 937 N.E.2d at 1003 (holding five percent liquidated damages were reasonable and noting it "reflected the 'industry norm'" in the context of the case's real estate transaction). Similarly, after six months and payment of the second five percent deposit, RBW would have been entitled to retain only ten percent in total deposits, also not an unprecedented amount. Cf. Allen v. Wenger, No. 07-P-426, 2008 WL 3877182, at *2 (Mass. App. Ct. Aug. 22, 2008) ("A deposit of ten percent on a real estate contract does not appear unreasonable on its face."); see also Lynch v. Andrew, 481 N.E.2d 1383, 1386 (Mass. App. Ct. 1985) (liquidated damages provision of purchase and sales agreement calling for retention of $25,400 deposit for failure to obtain $155,000 mortgage was not so unreasonable as to constitute an unenforceable penalty).

The parties' protestations notwithstanding, what happened to the general real estate market beginning in 2008 is irrelevant to a first look analysis. Even in 2004 it would have been evident that RBW faced multiple risks in the event of buyer breach: the real estate market could not be predicted with certainty or specificity that far out, there were potential costs related to finding replacement buyers, and there were financial risks associated with carrying the expenses of the units during

-23-

condominium construction and beyond.  Compounding these risks was the fact that, as noted, these units were part of a niche luxury residential condominium market, with price tags so high that the potential-buyer pool was naturally limited.

Because the facts pleaded would not support a plausible inference that the liquidated damages provision was unconscionable, we affirm the district court's dismissal of this count.[12]

**E. Mass. Gen. Laws ch. 93A**

Taken together, §§ 2 and 9 of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, permit a plaintiff to sue for injury resulting from unfair or deceptive business practices. Gossels v. Fleet Nat'l Bank, 902 N.E.2d 370, 378 (Mass. 2009). "There is no binding definition of what constitutes an unfair practice under [the Act]," and "[t]he existence of unfair . . . practices must be determined from the circumstances of each case."  Green v. Blue Cross & Blue Shield of Mass., Inc., 713 N.E.2d 992, 996 (Mass. App. Ct. 1999) (citation omitted)(internal quotation marks omitted).

Edlow says that RBW violated the Act "[i]n making material misrepresentations to [him], in failing to provide accurate and timely information concerning the status of the

---

[12] The plaintiff sought a declaratory judgment under Mass. Gen. Laws ch. 231A § 1, et seq., that he is entitled to the return of his deposits on the second unit, with interest.  We affirm the district court's denial of this request, because the liquidated damages provision was not unconscionable.

-24-

project, in failing to make disclosures that would have influenced [him] not to close on [the first unit], in insisting on its right to retain [his] 20% deposit as liquidated damages despite the unconscionability of the forfeiture, and in failing to provide full performance as of the date set for the closing."[13]  We have explained why the latter two claims cannot form any basis for relief.  Additionally, whether or not proof of the alleged misrepresentations or failures to disclose could lead a fact-finder to conclude that RBW has committed "an 'immoral, unethical, oppressive, or unscrupulous' business act as required by [chapter] 93A," see Gossels, 902 N.E.2d at 375, under Massachusetts law Edlow cannot prevail on claims for unfair and deceptive trade practices "unless [he] can also prove that [his] reliance on the allegedly false statements was reasonable."  Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc., 62 F. Supp. 2d 236, 241-42 (D. Mass. 1999) (emphasis in original) (citation omitted); see also Aspinall v. Philip Morris Cos., Inc., 813 N.E.2d 476, 488 (Mass. 2004) (holding that conduct is actionably "deceptive when it has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted (i.e., to entice a reasonable consumer to purchase the product)" (emphasis added)).  For the reasons previously discussed,

_____

[13] We presume that the "closing" referred to at the end of this claim was the scheduled August closing on the second unit.

-25-

no reasonable fact-finder could conclude that Edlow's reliance upon the allegedly false statements was reasonable.[14]

## F. The Motion to Amend

Finally, the plaintiff argues that the district court erred in denying his motion to amend the complaint. See Fed. R. Civ. P. 15. We review denials of motions to amend for abuse of discretion. Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 132 (1st Cir. 2006). Leave to amend is "freely given when justice so requires," Fed. R. Civ. P. 15(a), but courts have discretion to deny such motions under appropriate circumstances, including undue delay and futility. Palmer, 465 F.3d at 30.

There was no abuse of discretion. Edlow filed the original complaint in November 2009 and sought to amend it only after the May 2010 hearing on the motion to dismiss at which the court expressed serious doubts that the complaint was sufficient to survive dismissal. During the intervening six months, however, no "newly discovered evidence, not previously available, . . . came to light." Id. at 31. To the contrary, the factual predicates on which the proposed amended complaint is based are the same as those in the original complaint and were known to Edlow before he filed suit. See Id. Although the amended complaint does elaborate on the factual context of several of the counts, the proposed

---

[14] In his proposed amended complaint, Edlow elaborates somewhat on his reliance, but he does not assert additional facts that would make such reliance plausibly reasonable.

amendments are futile because they do not rectify his claims' fundamental flaws and thus save them from dismissal, for the reasons already discussed above. See Platten, 437 F.3d at 132 ("Since denial of plaintiffs' motion as futile would be appropriate if the amended complaint still failed to state a claim sufficient to survive a motion to dismiss, our review . . . is, for practical purposes, identical to review of a Rule 12(b)(6) dismissal based on the allegations in the amended complaint.").[15]  In view of the timing and futility of the proposed amendments, we affirm the district court's denial of Edlow's motion.

### III. CONCLUSION

We **affirm** the dismissal of all claims, as well as the denial of the motion to amend.

**So ordered.**

---

[15] Prior to the motion to amend, Edlow maintained that he was not claiming fraud in the inducement.  In Count V of the proposed amended complaint he alleged that RBW "fraudulently induc[ed] [him] to enter into the Three-Unit Agreement."  This conclusory allegation fails to meet the general pleading standards under Rule 8(a); accordingly, neither can it meet the heightened pleading standards required for fraud.  See Linear Retail Danvers 1, LLC v. Casatova, LLC, 2008 WL 2415410, at *2 (Mass. Super. June 11, 2008) (citing Equip. & Sys. for Indus., Inc., 798 N.E.2d at 574) ("At a minimum, a complaint alleging fraud must particularize the identity of the person(s) making the representation, the contents of the misrepresentation, and where and when it took place.").  Amending the complaint to add this allegation would therefore be futile.